IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 26, 2020 Session

## LEMARICUS DAVIDSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 111962   Walter C. Kurtz, Judge**

_____

### No. E2019-00541-CCA-R3-PD

_____

The Petitioner, Lemaricus Davidson, was convicted in the Knox County Criminal Court of numerous offenses against the two victims, Christopher Newsom and Channon Christian, including multiple counts of first degree felony and premeditated murder, and the jury imposed sentences of death for each murder conviction. After this court and our supreme court affirmed the Petitioner's convictions and sentences, he filed post-conviction and coram nobis petitions, seeking relief from those first degree murder convictions and death sentences. The post-conviction court found that trial counsel were deficient for not requesting a change of venue but that no prejudice resulted from trial counsel's deficient performance and denied relief. The coram nobis court also denied relief. In this consolidated appeal, the Petitioner raises various issues, including that the post-conviction court erred by denying his request for expert services; that the post-conviction court erred by determining that a codefendant's anticipated testimony at another codefendant's upcoming trial was not relevant to the Petitioner's claim for post-conviction relief; that trial counsel were ineffective because they failed to request an out-of-county jury, improperly handled voir dire, and failed to raise certain issues on direct appeal of his convictions; and that he is entitled to coram nobis relief because a codefendant's new testimony may have led to a different verdict as to the first degree premeditated murders of the victims. Based upon our review of the oral arguments, the record, and the parties' briefs, we conclude that the post-conviction court erroneously determined that a codefendant's anticipated testimony at another codefendant's upcoming trial was not relevant to the Petitioner's claim for post-conviction relief because the testimony would have invalidated one of the four aggravating circumstances found by the jury to impose the Petitioner's death sentence for Mr. Newsom. However, we also conclude that the error was harmless beyond a reasonable doubt. We agree with the post-conviction court that trial counsel were deficient for not requesting a change of venue and that the Petitioner has failed to demonstrate he was prejudiced by trial counsel's deficient performance. Therefore, we affirm the denials of post-conviction and coram nobis relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

John David Watkins, William Edgar Howell, III, and Christopher M. Minton, Nashville, Tennessee, for the appellant, Lemaricus Davidson.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Monette Fitzgerald and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The crimes in this case occurred during the weekend of Saturday, January 6, 2007. The Petitioner and his codefendants, George Thomas, Letalvis Cobbins, Eric Boyd, and Vanessa Coleman, kidnapped, robbed, raped, and killed the two victims, Christopher Newsom and Channon Christian.[1] The victims were leaving a friend's apartment Saturday evening when the defendants carjacked them and took them to the Petitioner's house. The facts are summarized in our supreme court's opinion from the Petitioner's direct appeal of his convictions as follows:

Mr. Davidson and his accomplices, using guns, kidnapped Chris and Channon and stole Channon's vehicle. They tied Chris's and Channon's hands behind their backs and stole money and personal items. After raping Chris, Mr. Davidson and his accomplices forced Chris to walk without shoes, socks, or pants on a January night to a desolate area beside a set of train tracks. They bound his feet with his belt. They blindfolded Chris, stuck a sock in his mouth and secured it with a shoelace, and wrapped a hooded sweatshirt around his head. They shot him three times and killed him. Two of the bullets removed from Chris's body were shot from the same gun and shared class characteristics with the High Standard revolver Mr. Davidson had in his possession when he was arrested. To hide the evidence of the murder, they wrapped Chris's body in a comforter, poured gasoline on him, and set his body on fire. Afterwards, Mr. Davidson was seen wearing Chris's

_____

[1] Ordinarily, it is the policy of this court to refer to victims of sexual assault by their initials. However, given that our supreme court referred to the victims by their first and last names in its opinion on direct appeal of the Petitioner's convictions, we will forgo the use of their initials in this opinion.

shoes.  Within an hour of the murder, Mr. Davidson tried to contact his girlfriend by using Chris's cell phone.

After killing Chris, Mr. Davidson and his friends returned to Mr. Davidson's house where they beat and repeatedly raped Channon.  Abusing her for many hours, they then tied her into a fetal position, secured a plastic bag tightly over her head, put her in five plastic garbage bags, and stuffed her in a garbage can to suffocate to death.  While Channon was dying in the garbage can, Mr. Davidson left to spend time with his girlfriend.  He gave Channon's clothes and personal items to his girlfriend.

*State v. Davidson*, 509 S.W.3d 156, 214 (Tenn. 2016).

On January 11, 2007, officers from the Knoxville Police Department arrested the Petitioner in a vacant house in Knoxville.  *Id.* at 176-77.  Mr. Newsom's Nike athletic shoes and a .22 caliber High Standard revolver were found in the house.  *Id.* at 177.  The Petitioner waived his rights and gave a statement to the police in which he told more than five versions of what occurred from January 6 to January 8.  *Id.*  Initially, the Petitioner claimed that he was not at his house during that time and did not know what may have occurred there.  Id. Ultimately, though, he claimed that Cobbins and Thomas arrived at his house with Mr. Newsom and Ms. Christian about 10:00 p.m., "saying they had carjacked some people and they were in the vehicle."  *Id.*  The Petitioner also claimed that Cobbins and Thomas left with the victims for less than twenty minutes and returned only with Ms. Christian.  *Id.* The Petitioner denied having sex with Ms. Christian and said that his DNA would not be found on her.  *Id.*

The State presented the following forensic and scientific evidence at the Petitioner's trial:  Mr. Newsom was anally penetrated one to two hours before he died and had "significant" injuries to his anal and genital areas.  *Id.* at 178.  He was shot three times, each time with a small-caliber bullet, and the fatal shot was fired with the muzzle of the gun against his head.  *Id.*  Mr. Newsom was found with a bandana tied around his eyes; a sock stuffed into his mouth; and bare, muddy feet.  *Id.*  His wrists had been tied together behind his back with a shoelace, and his ankles had been bound together with his belt.  *Id.* He was wearing a shirt, t-shirt, and underwear but no other clothing.  *Id.*  Semen was in his anus, but the high temperature of the fire destroyed the DNA in the semen.  *Id.*

Ms. Christian suffered injuries around and to her mouth in the hours before her death, including a torn frenulum, and the injuries were caused by an object, such as a penis, being forced into her mouth.  *Id.*  Her anal and genital areas suffered "tremendous" damage one to two hours before her death.  *Id.*  Some of her injuries were "so grave" that they had to have been caused by a blunt object.  *Id.*  Ms. Christian also had bruises on the back of

her arms, the top of her head, the front of her legs, and her upper back close to her neck. *Id.* Carpet burns and scratches were on her lower back and upper buttocks. *Id.* She was in a "tight fetal position" in the garbage can and had a white plastic bag over her head that had been knotted in back to keep it in place. *Id.* at 178-79. She suffocated due to the plastic bag over her head and "due to her positioning" in the garbage can, and her time of death was estimated to have occurred between Sunday afternoon and Monday afternoon. *Id.* at 179. She was found wearing only a camisole and a sweater. *Id.*

The Petitioner's DNA from sperm was in Ms. Christian's vagina and anus and was on her jeans. *Id.* Cobbins's DNA was in her mouth and on her camisole, sweater, and jeans. *Id.* Fabric found with Mr. Newsom's body and fabric used to bind Ms. Christian in the garbage bags came from curtains and fabric that had been given to the Petitioner. *Id.* The Petitioner's fingerprints and palm prints were found on three of the five plastic garbage bags that contained Ms. Christian's body, and a palm print on the outermost exterior garbage bag was consistent with his having lifted the bag with weight in it. *Id.* His prints also were on items belonging to both victims that were found in his house. *Id.* Two bullets recovered from Mr. Newsom could have been fired from the High Standard revolver that was in the Petitioner's possession at the time of his arrest. *Id.* A revolver associated with Cobbins was eliminated as the murder weapon. *Id.*

A Knox County Criminal Court Jury convicted the Petitioner of sixteen counts of first degree felony murder; two counts of first degree premeditated murder; two counts of especially aggravated robbery; four counts of aggravated kidnapping; nine counts of aggravated rape of Ms. Christian; three counts of facilitation of aggravated rape as a lesser-included offense of aggravated rape of Mr. Newsom; one count of theft of property valued $10,000 or more but less than $60,000; and one count of theft of property valued $500 or less.[2] *Id.* at 180. In finding the evidence sufficient to support the first degree murder convictions, our supreme court stated as follows:

> Mr. Davidson and his friends could have released Chris and Channon unharmed after stealing Channon's vehicle. Mr. Davidson did not know Chris and Channon and had no reason to kidnap, rape, and murder them. Chris and Channon had no defensive wounds. According to Mr. Davidson, Channon asked him if she was going to die, indicating she likely knew her fate. Viewing the facts in the light most favorable to the State, a reasonable jury could have easily found beyond a reasonable doubt that Mr. Davidson acted with premeditation when he shot Chris three times and killed him and bound Channon and stuffed her into a garbage can to die. A reasonable jury could have easily found beyond a reasonable doubt that Mr. Davidson

---

[2] After the jury returned its verdicts, the State dismissed two felony murder counts, and the trial court merged various counts. *See id.* at 180.

- 4 -

committed these murders while also committing the crimes of kidnapping, robbery, and rape.

*Id.* at 214.

The defendants were tried separately in Knox County, and the Petitioner was the second to go to trial. Cobbins was tried first before Judge Richard Baumgartner in August 2009. The jury was selected in Davidson County. Although the State sought the death penalty, Cobbins received sentences of life without the possibility of parole for the first degree murder convictions plus one hundred years for the remaining convictions. *State v. Letalvis Darnell Cobbins*, No. E2013-00476-CCA-R3-CD, 2014 WL 4536564 (Tenn. Crim. App. at Knoxville, Sept. 12, 2014). The Petitioner was tried next before Judge Baumgartner in October 2009 and chose a jury from Knox County. After he was convicted, the jury imposed two death sentences for the first degree murder convictions, and he received forty years for the remaining convictions. In support of the death penalty, the jury found the existence of three aggravating circumstances for the murder of each victim: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding, interfering, or preventing a lawful arrest; and (3) the murder was committed during the perpetration of another felony. *Davidson*, 509 S.W.3d at 219 (citing Tenn. Code Ann. § 39-13-204(i)(5), (6), (7)). The jury found the existence of one additional aggravating factor for the murder of Mr. Newsom: the defendant knowingly mutilated the body of the victim after death. *Id.* (citing Tenn. Code Ann. § 39-13-204(i)(13)). Thomas was tried before Judge Baumgartner in December 2009 and received life without the possibility of parole for the first degree murder convictions. A new trial was granted, and he was retried before Judge Walter C. Kurtz in 2013 and received life sentences for the murder convictions plus twenty-five years for the remaining convictions. *State v. George Geovonni Thomas*, No. E2013-01738-CCA-R3-CD, 2015 WL 513583 (Tenn. Crim. App. at Knoxville, Feb. 5, 2015). Coleman was tried twice and ultimately received an effective thirty-five-year sentence for her involvement in the crimes. *State v. Vanessa Coleman*, No. E2013-01208-CCA-R3-CD, 2014 WL 6908409 (Tenn. Crim. App. at Knoxville, Dec. 9, 2014). Boyd was convicted on two federal charges of being an accessory after the fact to carjacking and misprision of a carjacking related to his involvement in these crimes. *United States v. Boyd*, 640 F.3d 657 (6th Cir. 2011). In March 2018, the Knox County Grand Jury charged Boyd by presentment with various offenses related to the deaths of the victims. He went to trial in August 2019 and ultimately received two life sentences for the first degree murders of Mr. Newsom and Ms. Christian plus ninety years for the remaining convictions. His case is currently on appeal before this court.

On March 10, 2011, Judge Baumgartner resigned due to allegations of drug abuse. At that time, motions for new trials were pending in the cases of all of the defendants except

Boyd; Boyd had not yet been charged in state court. Senior Judge Jon Kerry Blackwood was assigned to the cases. He determined that he could not act as thirteenth juror due to Judge Baumgartner's out-of-court conduct and, thus, granted the Petitioner, Cobbins, and Thomas new trials. The State sought an application for permission to appeal the rulings pursuant to Rule 10, Tennessee Rules of Appellate Procedure. This court initially denied the application, but our supreme court granted the State's request for relief. *State v. Letalvis Cobbins, Lemaricus Davidson and George Thomas*, No. E2012-00448-SC-R10-DD (Tenn. May 24, 2012) (order). Our supreme court held that "in the absence of controlling authority otherwise, we decline to hold that a trial judge's out-of-court misconduct, by itself, constitutes structural error unless there is proof that the misconduct affected trial proceedings." *Id.* Therefore, the court concluded that Judge Blackwood erred in granting new trials to the Petitioner, Cobbins, and Thomas and remanded the cases to Judge Blackwood for further review. *Id.* Coleman was granted a new trial based on Judge Baumgartner's in-court conduct during the trial proceedings, but the State did not challenge that ruling in the extraordinary appeal. *See id.*

On remand, Judge Blackwood again decided that he could not act as thirteenth juror. Based upon actions detailed in this court's opinion, the State again sought, and was granted, permission to appeal Judge Blackwood's order denying the State's motion to recuse. See *State v. Letalvis Cobbins, Lemaricus Davidson, and George Thomas*, No. E2012-02025-CCA-10B-DD, 2012 WL 5266427 (Tenn. Crim. App. at Knoxville, Oct. 25, 2012), *perm. app. denied,* (Tenn. Feb. 12, 2013). This court concluded that Judge Blackwood should have recused himself in the three cases. *Id*. at *18. On remand, Judge Kurtz was designated to proceed on the motions for new trials filed by the Petitioner, Cobbins, and Thomas. Judge Kurtz eventually denied the Petitioner's motion for new trial. The Petitioner's convictions and sentences were then affirmed on direct appeal. *Davidson*, 509 S.W.3d at 171.

The Petitioner timely filed a *pro se* post-conviction petition on December 4, 2017. Following the appointment of counsel, the filing of several amendments to the original petition, and an evidentiary hearing, the post-conviction court denied relief. The Petitioner now appeals that ruling.

Meanwhile, on June 24, 2019, the Petitioner also filed a petition seeking coram nobis relief. Therein, he argued that he was entitled to a new trial and/or sentencing hearing because of new evidence, mainly that Thomas had agreed to testify for the State in Boyd's then-upcoming trial that Boyd, not the Petitioner, shot and killed Mr. Newsom and burned his body. Thomas would further testify that the Petitioner was not present at the scene when Mr. Newsom was killed. The Petitioner became aware of the Thomas evidence in September 2018. Evidently, Thomas agreed to a sentence reduction in exchange for his testimony in Boyd's trial. The Petitioner previously sought to delay the post-conviction

evidentiary hearing based on the discovery of this new evidence, but the post-conviction court denied that request. Following a subsequent hearing on the coram nobis petition, the coram nobis court denied relief. The Petitioner also now appeals that ruling.

This court has consolidated the Petitioner's appeals of the denial of post-conviction and coram nobis relief. Tenn. R. App. P. 16(b). We will individually address the issues raised by the Petitioner in support of his request for relief under both the post-conviction and coram nobis statutes.

## Post-Conviction

*Evidentiary Hearing Testimony*

Attorney David Miller Eldridge testified that he served as "first chair" counsel during the Petitioner's trial. He had practiced primarily criminal law in Knoxville since 1988 and previously had represented two or three defendants in capital cases. Eldridge was board certified as a criminal trial advocate in addition to having received other professional accolades. Along with Douglas A. Trant, whom Eldridge respected and selected to be appointed after the State filed its notice of intent to seek the death penalty, the defense team also utilized the services of two other attorneys and law clerks in Eldridge's firm at the firm's own expense. Eldridge stated that the defense team's case file filled twenty to twenty-five Bankers Boxes.

Eldridge recalled that the Petitioner had moved to Knoxville about six months before the crimes and that the other codefendants were not from Knoxville. The two victims were from Knoxville. Eldridge said the extensive media coverage began as soon as the crimes occurred and continued throughout the Petitioner's trial, as well as the trials of his codefendants. The media portrayed the crimes as "torture slayings," and the Petitioner was characterized as the "ringleader." Eldridge said the media covered "essentially, every aspect of this case"; he had not handled another case that "generated [that] level of media coverage." The defense team maintained a file and collected a substantial number of local articles which had reported on the case. Eldridge did not specifically recall, however, collecting or comparing news articles or reports from other jurisdictions. The defense did not poll people in the local community to determine their knowledge about the case.

Eldridge testified that posts on various media websites contained hostile comments directed toward defense counsel and that he tried to avoid reading them. He referred to a specific article in the *Knoxville News Sentinel*, which included a photograph showing counsel and the Petitioner smiling while seated at counsel's table in the courtroom. Someone mailed a copy of that photograph to counsel along with a threat to them and their

families. Eldridge forwarded the mail to federal law enforcement officials. He recalled that comments expressed opinions that the defendants did not need to face trial but, instead, "should all be killed." He also remembered that some people believed the case would have received more attention in the national news if the victims had been black and the perpetrators had been white. Eldridge recalled that a Ku Klux Klan march occurred on Main Street before trial.

Eldridge testified that Cobbins, Coleman, and Thomas all moved for a change of venue based, primarily, on pretrial publicity. Instead of having their trials moved out of Knox County, those three codefendants received a change of venire. In July 2009, Trant e-mailed Eldridge and suggested that they keep a jury of Knox County residents. Prior to that suggestion, Eldridge had assumed they also would move for a change of venue. In fact, he replied to Trant expressing his concern that seating a jury with people from Knoxville who had not already heard or formed an opinion about the case would be difficult. Eldridge thought that "there was a lot of inflammatory commentary" about this case that was "potentially prejudicial" to the Petitioner. Eldridge deferred to Trant's decision, however, because Trant had more experience in trying capital cases. Eldridge knew that if a jury could not be seated in Knox County, the case would still have to be tried. He testified that as lead counsel, he should have overridden Trant's decision.

Eldridge testified that counsel discussed the matter with the Petitioner. Eldridge thought the Petitioner understood the risks and benefits of both options. Eldridge also thought the Petitioner understood counsel's strategy to use the extensive pretrial publicity to their advantage in jury selection in hopes of not being able to seat a jury in Knox County. However, counsel informed the Petitioner that they "might very well get a jury" from Knox County. Eldridge stated that their strategy was "questionably, a risky effort"; therefore, they might end up with jurors who had been exposed to prejudicial pretrial publicity. Eldridge remembered Trant saying, in light of the "extraordinary" evidence against the Petitioner and the denial of numerous motions to suppress, that "desperate times call for desperate measures." Eldridge acknowledged that even a jury from another jurisdiction would have heard the same evidence and that he "did not have confidence that a jury from another jurisdiction would react to these facts any differently." He also thought the death penalty "was a real possibility" even with an out-of-county jury. Ultimately, the Petitioner voiced no objection to trying to seat a Knox County jury.

Eldridge testified about the jury questionnaires and jury selection expert the defense team employed. That expert preferred trying to seat a jury from another jurisdiction. Eldridge also recalled that the trial judge had been making arrangements for an out-of-county jury prior to counsel's announcement that they would seat a jury from Knox County. Eldridge did not think counsel had a basis to strike for cause those jurors who ended up on the panel. Furthermore, counsel did not exercise all of their peremptory challenges because

their expert advised them that there were less favorable jurors remaining in the pool. The trial judge gave counsel "a great deal of leeway" and did not rush them during jury selection. Counsel discovered that a number of potential jurors knew about the case, but those jurors stated they could set aside any preconceived opinion and decide the case on the facts presented. Eldridge stated that although counsel could have done a better job, he thought they tried to address the racial undertones of the case during jury selection.

Eldridge testified that the defense moved to suppress the Petitioner's statement to the police, and he identified a newspaper article discussing that statement. Eldridge also identified articles discussing the inadmissibility of the Petitioner's prior conviction for carjacking but the admissibility of his prior conviction for aggravated robbery as well as articles reporting on some other unrelated charges. Eldridge agreed it was important for the defense to limit potentially damaging evidence about the Petitioner's criminal history from reaching the jury.

Eldridge testified that the defense theory of the case was to attempt to blame the Petitioner's codefendants and to establish an alternative theory about why the victims were at the Petitioner's house. Counsel zealously tried to defend the Petitioner without regard to the public's reaction about the theories. Counsel's actions were not dictated one way or the other by any threats they received.

Eldridge testified that Cobbins received a sentence of life without the possibility of parole despite the State having sought the death penalty. Eldridge watched Cobbins's trial as it was being broadcast live. Cobbins's trial strategy was to place the bulk of the blame on the Petitioner, and the public was aware of that strategy prior to the Petitioner's trial. Cobbins and the Petitioner shared some of the same family members, and counsel decided not to call some of those individuals as witnesses because their sentencing hearing testimony at Cobbins's trial could have been harmful to the Petitioner. Eldridge did not consider the evidence against Cobbins to be "as strong" as the evidence against the Petitioner. Specifically, the DNA and fingerprint evidence were more damaging to the Petitioner. Additionally, the Petitioner rented the house where most of the crimes occurred.

Eldridge testified that counsel met with the Petitioner many times and never witnessed any signs of intellectual disability. The Petitioner appeared intelligent, and he was polite and courteous. He asked counsel questions about his case and was able to read the written materials counsel provided to him. Eldridge did not raise any concerns about the amount of time Dr. Peter Brown, their mitigation expert, spent with the Petitioner prior to trial. There was no evidence of any organic brain damage.

Eldridge testified that he did not notice any evidence of impairments by Judge Baumgartner during the trial and that he was "shocked" to learn about the judge's

addiction. As far as the atmosphere in the courtroom, Eldridge said he would not describe it as a "circus." However, the victims' families visibly expressed their anger about the case. Eldridge recalled that "the tension was palpable at all times. And the jury would have had to have picked up on that."

Attorney Douglas A. Trant served as "second chair" counsel for the Petitioner at trial. He had maintained a criminal law practice almost exclusively for approximately thirty years and had been certified as a "Criminal Trial Specialist" for about thirteen years. The "division of labor" on the case was shared equally between the two attorneys. They filed numerous pretrial motions with the intent of trying to suppress as much of the State's evidence as possible, and they worked together on the mitigation aspect of the case. They traveled to Jackson and Memphis to interview the Petitioner's foster parents and other family members. Trant said the Petitioner's family members were, "unfortunately," not cooperative. The defense team employed a mitigation specialist and a psychiatrist to assist with mitigation.

Trant testified about the extensive and "sensational" media coverage of the case. All of the Knoxville television stations, some of the radio stations, and the *Knoxville News Sentinel* covered every aspect of the case from the pretrial hearings until the last day of the trial. Although the media generally portrayed defense counsel as appointed attorneys "just doing their job," many online comments were "hateful" and "threatening." The reactions of the victims' family members were covered extensively by the media. Trant recalled that the families were "very angry, bitter [and] hurt." He also recalled threats from the families and having his access to the courtroom blocked at times by the families and their supporters. The victims' family members sat near the jury during the trial and reacted "physically to testimony, they reacted audibly." They also wore buttons in support of the victims.

Trant testified that he did not let the publicity or negative attention toward him affect his performance as a defense attorney. This case was his tenth capital case that went to verdict and, other than one prior case where the death sentence was ultimately reversed on appeal, the only one in which the jury imposed a death sentence. He thought he "did the best [he] could" for the Petitioner. Trant acknowledged that the evidence against the Petitioner was "overwhelming and very damaging."

Trant recalled that Randy Nichols, the Knox County District Attorney General at the time, asked if the Petitioner would be interested in pleading guilty in exchange for a sentence of life without the possibility of parole. The Petitioner firmly declined that offer. Trant's understanding of why the Petitioner turned down the offer was that "he would just as soon have death . . . that the difference between the two was not a difference with distinction for him. And he was steadfast in that regard." After the trial, though, the

Petitioner was upset. Trant explained, "I went back to the dock to talk with him and he was crying then. He said, you know, it's one thing to anticipate it all this time, but it's another thing to finally get it. So I think it finally hit him hard - that he was sentenced to die. And I think up until that time his resolve was to fight it."

Trant testified that he proposed seating a jury from Knox County based upon his experience in a prior capital case in Claiborne County which resulted in a hung jury. According to Trant, Tennessee law only allowed a defendant to move for a change of venue. Based on that understanding, he presented a trial strategy to Eldridge that the Petitioner not move for a change of venue in hopes of not being able to seat a jury from Knox County. Trant thought that if the jury selection process dragged on, the State might be forced to negotiate further. He "remember[ed] telling [the Petitioner] that if the jury believed that he did what the State said he did, we could get a jury from Mars and I thought they would give him the death penalty." Trant said the rapes and murders occurred at the Petitioner's house, the Petitioner "came from Memphis selling drugs," and the Petitioner "probably initiated this carjacking." Therefore, Trant thought the Petitioner's culpability was greater than that of Cobbins, who received a lesser sentence with an out-of-county jury. Furthermore, the Petitioner was going to have less mitigation support from his family members at sentencing than Cobbins had.

Trant testified that he told the Petitioner that "if we were not able to seat a jury, that they could not try him and they could not convict him." Trant acknowledged that he was unaware of any case at that time in which "a Judge had to throw up his or her hands and say, well, I just can't get a jury in this county and Mr. Defendant, you -- you can walk out of here." Although Eldridge disagreed with Trant's strategy, the Petitioner sided with Trant, so the defense ultimately chose to seat a jury from Knox County. However, the defense team did not make their decision lightly. Trant understood that the trial judge was likely to grant a request for an out-of-county jury as the judge had done in the codefendants' cases, but Trant was "not a fan of picking a jury somewhere else and bringing them back to the community." He stated, "I mean, if the community is outraged, then trying the case here in Knox County is bound to spill over to a jury, I think, no matter if they're sequestered." The Petitioner was present in the courtroom when counsel announced that they would not seek a change of venue or venire.

Trant recalled that jury selection lasted eight days. Despite their hopes of reaching a settlement with the State, defense counsel approached jury selection with the intention of obtaining a fair and impartial jury. Counsel secured the services of a jury selection expert to assist with evaluating all potential jurors before and during the selection process. They researched the jurors, including looking into the jurors' social media accounts. The trial court permitted individual voir dire. Trant said "it was fairly evident early on" in the process when they realized they would be able to seat a jury in Knoxville because they

"didn't get the number of challenges for cause that [they] hoped [they] might." Similarly, Trant stated they did not need to use all of their peremptory challenges. When questioned by the post-conviction court as to whether the defense team was satisfied with the jury, Trant replied, "I don't know that we were satisfied. I think we were satisfied that we had done the best we could under the circumstances. Whether it was a fair and impartial jury, I don't know." Trant thought they carefully explored the potential jurors' exposure to pretrial publicity. He did not recall, though, whether jurors were asked about potential racial undertones in the case. Trant said there was nothing he would have done differently regarding jury selection.

Trant testified that he knew Judge Baumgartner personally as a friend. However, they had fallen out of favor with one another by the time the Petitioner's trial started. Trant also knew Judge Baumgartner had a reputation for using illegal drugs throughout his career as an attorney and judge, but Trant did not see any signs that Judge Baumgartner was under the influence of drugs during the Petitioner's trial.

Trant testified that he met with the Petitioner "dozens" of times during trial preparation, and he described the Petitioner as "a smart guy . . . always engaged, intelligent, a perfect gentleman, was not afraid to ask questions." Trant saw no signs of intellectual impairments, and Trant entertained no doubt about the Petitioner's understanding of the content of their discussions or the intent of counsel's trial strategies. Trant updated the Petitioner regularly about defense counsel's work on the case.

Attorney Loretta Gene Cravens testified that she was employed by Eldridge's law firm and that she assisted the Petitioner's defense team. Cravens was not appointed to represent the Petitioner and, thus, was not compensated by the State for her work on the case. She was primarily responsible for discovery management and observing the jury during the trial. Cravens met with the Petitioner regularly. She found him to be intelligent, and she did not notice any signs of intellectual disability. The Petitioner interacted well with his attorneys and asked questions about his case. Cravens said that there were many outbursts in the audience during the trial and that the jury would have heard the outbursts. She also recalled an instance in which a member of the prosecution fainted during testimony about the autopsy photographs. Defense counsel moved for a mistrial, but the trial court denied the motion. Cravens did not recall anything to indicate Judge Baumgartner was impaired during the trial.

Cravens remembered that the media coverage characterized the Petitioner as the "ringleader" of the crimes. The defense team monitored the media coverage before trial and maintained a media file containing numerous articles. Although they collected stories from other jurisdictions, they focused their efforts on the Knoxville media. Their collection contained reports related to the cases against the Petitioners' codefendants as well,

including numerous articles published in the spring of 2008 during Boyd's federal trial. The defense was aware of several Facebook group pages related to this case, and Cravens monitored those pages to determine if any potential juror had joined any of the groups. One potential juror who had joined was dismissed from the jury pool. Cravens was not involved in the decision to try the case in Knox County. She recalled that the media was present in the courtroom during every hearing in this case and that Court TV live-streamed Cobbins's trial.

Cravens recalled that the *Knoxville News Sentinel* discontinued the public comments to the articles about the case on the newspaper's website because some of the comments were threatening toward the people involved. Other media websites allowed online comments to continue. Eldridge, his children, and Trant received threats. Although Cravens was not singled out, she was distressed by the threats in general. However, the threats did not affect defense counsel's tactical decisions. As a result of the threats, the defense team instituted security measures during its representation of the Petitioner, such as logging threatening telephone calls, avoiding making comments to the media, and traveling in groups to the courthouse. The courthouse also instituted some "significant" additional security procedures to protect the defense team. Specifically, additional security and plain-clothed law enforcement personnel were in the courtroom. The trial judge also issued directives each morning before trial, reminding everyone to maintain proper decorum.

Cravens testified about the racial tensions surrounding the case. The defense team knew that in 2008, the population of Knox County was approximately 430,000 with a composition of about 87.7 percent white people and 8.9 percent black people. Cravens specifically remembered a rally taking place sometime around May 2007 by a white supremacist group that was organized in direct response to the case. She also testified about the extensive misconception of the facts of this case that were spread by the media and throughout the community.

Cravens testified that she participated in part of the eight-day jury selection and that defense counsel was very methodical during the process. Counsel relied heavily upon their jury selection consultant. The consultant reviewed the extensive jury questionnaires and rated potential jurors based upon her own research and system. Cravens attended a strategy meeting between counsel and the jury consultant the weekend before the start of trial. According to Cravens, most of the potential jurors had heard something about the case. Moreover, jurors were questioned about the racial dynamics of the case.

Attorney Stephen Ross Johnson represented codefendant Thomas. Johnson testified that the University of Tennessee played a substantial role in the Knoxville community and that any story that related to the college certainly attracted the media's attention. Ms.

Christian was a student at the University. Johnson recalled that the media coverage of the killings was "pervasive and intrusive and constant . . . in a way [he had] never seen before in . . . Knoxville" over the previous twenty years he had lived there. Johnson described the media coverage of this case as "atypical" and said the coverage increased when the court hearings began in 2008 and early 2009. According to Johnson, the media "was pretty aggressive" in its attempts to interview the victims' family members for their reactions after court hearings. Johnson opined that, unlike at the time of this hearing in 2019, social media such as Facebook, Twitter, Instagram, and Snapchat were not as pervasive as in 2009. Thus, the media outlets would "drive traffic to their websites" by allowing online comments to their articles. Johnson believed that most of the comments were posted anonymously by local readers. The case was a constant topic of conversation in the community during that time.

According to Johnson, racial and socioeconomic factors played a part in the trials and were something defense counsel had to contemplate, especially during jury selection. Johnson recalled that "a march or a rally [in 2007] by the Ku Klux Klan down Main Street" occurred and that vigils for the victims were held at the University.

Jessica Thomson served as the paralegal supervisor and data systems manager for the Office of the Post-Conviction Defender and assisted counsel in preparing for the evidentiary hearing. She received a report from News Data Services (NDS), a media monitoring corporation, that contained reports about this case on local and regional television news broadcasts in Tennessee from January 2007 until October 2009. This case was mentioned 3,572 times on television news broadcasts in the state during that time period, with 3,111 reports occurring on Knoxville news stations. The NDS report also indicated that the case was mentioned 842 times on news broadcasts in Knoxville from January 2007 through March 2008 compared to 71 times in Nashville and 20 times in Chattanooga. From June 2007 until September 2008, the case was mentioned 696 times on television in Knoxville compared to 3 times in Chattanooga. On April 16, 2008, during the time of Boyd's trial, the case was mentioned 40 times on news broadcasts in Knoxville and reached an estimated three million viewers. From November 2008 through August 2009, the case was mentioned 417 times on news stations in Knoxville and zero times in Chattanooga. During Cobbins's trial in August 2009, the case was mentioned 478 times in Knoxville and 15 times in Chattanooga. The day Cobbins testified, there were 14 television news reports in Knoxville with an estimated 408,000 viewers while at the same time there was one report in Chattanooga with an estimated 25,000 viewers. When the verdict was announced in Cobbins's trial, the news stations in Knoxville reported on the case 98 times with an estimated three million viewers while there were 5 broadcasts in Chattanooga with an estimated 130,000 viewers.

The NDS report indicated that the Petitioner was referred to by the Knoxville news media as the alleged "ringleader" 76 times. The Chattanooga news twice referred to him as such. The Knoxville news stations also reported 53 times about testimony during the Boyd and Cobbins trials that characterized the Petitioner as being more culpable than his codefendants. They referenced the statements of the Petitioner's codefendants to the police 78 times. The Chattanooga news stations did not air stories about either of those details. The Knoxville stations aired stories about the Petitioner's prior convictions 63 times. None were aired in Chattanooga. During 37 broadcasts, the Knoxville stations aired stories featuring expressions of frustration from the victims' families about the sentence of life without the possibility of parole imposed by the jury in the Cobbins trial and statements suggesting the Petitioner deserved the death penalty. An estimated 12 million viewers saw those 300 plus broadcasts from January 2007 through October 2009. Only an estimated 60,000 viewers in Chattanooga saw similar broadcasts.

Thomson also surveyed articles from the *Knoxville News Sentinel* and the *Chattanooga Times Free Press*, which referenced this case during the same period of time from January 2007 until October 2009. There were 322 articles in the *Knoxville News Sentinel* with 100 of those appearing on the front page. There were 24 articles in the *Chattanooga Times Free Press* with none appearing on the front page. Cobbins's trial was mentioned 28 times in the *Knoxville News Sentinel*, with many articles appearing on the front page, and 4 times in the *Chattanooga Times Free Press*, with no articles appearing on the front page.

Thomson identified a front-page article from the *Knoxville News Sentinel* that was published on August 27, 2009, titled "Life Without Parole. Jury Rejects Death Penalty for Letalvis Cobbins." The article was accompanied by a picture of the father of one of the victims with a caption reading, "He Deserves to Die." Thomson also identified other articles from the *Knoxville News Sentinel* during that time period which reported on the Petitioner's prior conviction for carjacking, a prayer vigil for the victims held at the University, and the race and class differences between the defendants and the victims. Other articles commented about the difficulty jurors had in avoiding pretrial publicity in Boyd's trial and how potential jurors in the Petitioner's trial "could simply lie about a lack of opinion on [his] guilt or innocence." Thomson also identified an article printed during Cobbins's trial in which his defense attorney described the Petitioner as the "mastermind." Another article published before the Petitioner's trial quoted someone as saying the Petitioner's jury should come from Knoxville because "[t]hose people from outside Knox County don't know the whole story." Thomson also was able to view on the *Knoxville News Sentinel* website the unredacted statements the defendants gave to the police, which were posted in August 2009.

On cross-examination, Thomson acknowledged that the estimates of viewership of the various news broadcasts included areas surrounding Knox County. She also acknowledged that the estimates did not necessarily include "unique viewers." As to the online print media, Thomson agreed that it could have been viewed by people all over the world. Thomson stated that the media coverage declined from the date of the crimes until the beginning of the Petitioner's trial; however, it "ebbed and flowed" as well. According to Thomson, the number of television news broadcasts in Knoxville on certain dates between January 2007 and October 2009 averaged between 20 and 40. Thomson did not search the print media to determine how many times the Petitioner was referred to as the "ringleader." According to census data introduced during Thomson's testimony, Knox County had a population of approximately 430,000 in 2008, and Hamilton County had a population of about 308,000 in 2010.

The State did not call any witnesses during the evidentiary hearing. It only introduced into evidence the questionnaires and the transcript of the individual voir dire for the twelve jurors and the two alternates who sat on the trial.

At the conclusion of the parties' proof, the post-conviction court questioned Assistant District Attorney General Leland Price about how the jury selection process was conducted in this case. Price stated that several weeks before trial, "several hundred" potential jurors were summoned to appear. Some of those individuals were immediately excused due to hardships or criminal records. Judge Baumgartner then distributed written questionnaires to the remaining jurors to fill out. The creation of the questionnaires was a collaborative effort between both parties and the judge. Copies of the completed questionnaires were then given to the attorneys for both parties. The judge and both parties agreed that some of the prospective jurors should not be invited back to participate in individual voir dire because the responses on their questionnaires reflected unwavering views one way or the other about the imposition of the death penalty and, possibly as well, their opinion about the Petitioner's guilt. Those that were invited back returned to the courthouse about a week before trial.

The potential jurors were separated into groups for individual voir dire. Price recounted the "sort of informal" process that occurred: During questioning, the judge, the attorneys, and each prospective juror sat around a table. The judge first questioned each juror about his or her exposure to pretrial publicity and views on the death penalty. The judge also may have questioned the juror about "something that jumped out from their questionnaire." After the judge concluded his inquiry, the attorneys took turns questioning each juror. The attorneys followed-up on the issues of pretrial exposure to publicity and views on the death penalty. When all of the questioning was completed, Judge Baumgartner made the initial decision, based on hardships or responses to questions, as to whether a potential juror would be included in the final pool and participate in the group

voir dire that occurred before trial. In addition, the attorneys for both sides also agreed that some of the potential jurors should otherwise be excused from the final pool based on their responses to questions. Neither party used their peremptory challenges during the individual voir dire process. At that time, jurors were only challenged and/or excused for cause. Price stated that the final pool consisted of more than fifty jurors. The individual voir dire took eight days, and the final group voir dire occurred in one day immediately before the beginning of trial.

*Issues*

For the sake of clarity, we have reorganized the order of the issues presented in the Petitioner's post-conviction brief.

## I. *Post-Conviction Court's Management of Post-Conviction Proceeding*

First, the Petitioner raises the following issue regarding the post-conviction court's handling of the post-conviction proceeding: "The post-conviction trial court violated Article I, §§ 8 and 16 of the Tennessee Constitution and abused its discretion when it denied [the Petitioner] the expert funds, documents, and time needed to investigate, prepare, and present specified claims." Specifically, the Petitioner argues that the post-conviction court abused its discretion by refusing to authorize funds for the expert services of Dr. Pamela Auble, Dr. James Merikangas, Dr. Bryan Edelman, and Mr. Justin Levinson. He also contends that the post-conviction court denied him access to certain witnesses and records and did not afford him a sufficient amount of time to investigate and prepare for the evidentiary hearing. Finally, the Petitioner argues that the post-conviction court deprived him of his "right to due process and freedom from cruel and unusual punishment when it refused to hear claims that his death sentence is constitutionally invalid and requires resentencing" with respect to the anticipated testimony of Thomas at Boyd's then-upcoming trial.

### *Background*

In order to adequately address this issue, we will outline the procedural history of the Petitioner's post-conviction proceeding. We also have taken the liberty to quote extensively from several of the post-conviction court's orders in order to give context to the bases for the Petitioner's arguments.

The Petitioner filed his *pro se* petition on December 4, 2017. That petition was prepared with the assistance of the Office of the Post-Conviction Defender ("OPCD"). That office was eventually appointed as counsel of record on March 1, 2018. The order of appointment granted counsel thirty days to file any amendments to the *pro se* petition, and

the case was originally set for an evidentiary hearing on June 20, 2018. Almost immediately after their official appointment, counsel filed a motion to reschedule the initial deadlines imposed.

On May 10, 2018, the post-conviction court entered a new scheduling order which granted the Petitioner sixty additional days to file an amended petition. The court noted therein that "although the Post-Conviction Defender's Office was not appointed to represent Petitioner until March 1, 2018, attorneys from the Office assisted Petitioner in drafting his pro se petition for relief. Therefore, Petitioner's attorneys should be familiar enough with the case to file an amended petition within the time allowed." Soon thereafter, on May 16, 2018, counsel moved the court to extend the filing deadline for the amended petition. Counsel acknowledged in the motion that they had "[p]rior to and since appointment . . . diligently requested and reviewed records." Citing the one-year deadline imposed by the Post-Conviction Procedure Act for final disposition of petitions in capital cases, the post-conviction court granted the Petitioner until September 4, 2018, to file his amended petition. See Tenn. Code Ann. § 40-30-111(d). In its order, the court summarized the reasons offered by counsel for the requested extension: "Petitioner's attorneys provide a lengthy list of tasks they seek to undertake in their representation of Petitioner, including reviewing the trial transcripts from Petitioner's and codefendants' trials, travel to various cities in which Petitioner has lived, conferring with experts, and reviewing discovery." Noting that counsel did not request a specific deadline to file an amended petition, the court offered the following comments in support of its ruling:

> The undersigned judge, having presided over numerous death penalty trials and post-conviction proceedings over the past three decades, is well aware of the complex nature of death penalty cases. This Court will not "rush" this case to a conclusion so as to violate the parties' due process rights. The Court will balance the interests of all involved parties and the prevailing statutes, case law, and Supreme Court rules governing post-conviction cases in setting a briefing and hearing schedule which is reasonable. The Court is the ultimate arbiter of what is necessary to ensure a full and fair hearing in this case, not the parties.

> Counsel for the Petitioner appears to confuse the notice requirements of the petition with trial preparation. In all cases, the pleadings do not limit the attorneys' ability to prepare for the case up to the final hearing date. This Court certainly intends to allow the parties every opportunity to prepare for the final hearing in this death penalty post-conviction matter.

- 18 -

Counsel filed the Petitioner's amended petition on September 4, 2018, and the State filed its response thereto on October 4, 2018. Supplements to the amended petition also were filed on October 18, 2018, and December 17, 2018.

In the meantime, on July 2, 2018, the post-conviction court granted the Petitioner funding for investigative services. The Petitioner subsequently filed separate motions on July 23, 2018, seeking funding for the services of four experts: Dr. James Lipman, a pharmacologist, to evaluate the Petitioner's history of substance abuse; Dr. Pamela Auble, a neuropsychologist, to examine the Petitioner for evidence of brain dysfunction; Dr. Bryan Edelman, a social psychologist, to create a media analysis of the pretrial publicity; and Mr. Justin Levinson, a law professor, to review the extensive pretrial publicity for racial bias.

The court held an *ex parte* hearing on those motions and subsequently issued two orders on August 2, 2018, explaining the reasons for its rulings. The court acknowledged its obligations regarding the authorization of funding for experts in the Petitioner's capital post-conviction case. *See* Tenn. Sup. Ct. R. 13, § 5. The court granted, in part, funding for Dr. Lipman. The court denied specific funding for Dr. Edelman and Mr. Levinson but authorized separate funding for "a law student, paralegal, or other qualified person to aid Petitioner's counsel in researching, organizing, and presenting issues related to the pretrial publicity" in the case. The Petitioner also moved the post-conviction court to fund a ballistics expert, but the request was denied. Finding that the Petitioner failed to advance a particularized need, the court denied funding for Dr. Auble but gave the Petitioner an opportunity to file a renewed motion. The Petitioner filed his renewed motion on September 4, 2018, which the court denied after finding that the Petitioner again failed to show a particularized need for Dr. Auble's services. Another "supplemental" motion regarding funding for Dr. Auble also was subsequently denied.

Following a status hearing on October 3, 2018, the post-conviction court issued a "Case Management and Scheduling Order" on October 8, 2018, and set a hearing date for January 28, 2019. The court noted that the parties had indicated during the status hearing that neither anticipated filing any additional motions, but the court set a deadline for any such filings for December 17, 2018. The court also set deadlines for the parties to disclose any experts they intended to call as witnesses.

On October 18, 2018, the Petitioner filed renewed motions seeking funding for Dr. Edelman and the ballistic expert, both of which were denied by the court. As to Dr. Edelman, the court reiterated its finding that Dr. Edelman "would not substantially assist the Court in resolving the[] weighty issues" surrounding pretrial publicity and jury selection. Also on October 18, 2018, the Petitioner filed a motion to continue the hearing date set for January 28, 2019, which the court denied as well. The court explained:

The Court finds the assertion that Counsel cannot be ready to provide effective representation at a hearing to begin January 28, 2019, to be not credible. A reading of the 159 page *Amended Petition* filed on September 4, 2018, and the 31 page *Supplemental Petition* filed on October 18, 2018, clearly shows how conversant the two (2) very capable Counsel and their staff from the Office of Post-Conviction Defender are with this case. Further detailed and lengthy filings related to SCR 13, Sec. 5 proceedings further show their thorough knowledge of the issues and facts in this case.

Administration of court cases is Judge-controlled not lawyer-controlled. The Court has used its best judgment to strike a balance between moving this case forward and yet be assured that the parties can fully and fairly present their case.

There is probably not a lawyer in any significant case, criminal or civil, who will say that he/she doesn't need or want more time. This Court, however, has every confidence that Petitioner's Counsel are well capable and will be able to competently present their client's claims at the hearing scheduled for January 28, 2019. The Court has considered the issues in this case and the contention of the Petitioner as to his need to produce witnesses and other evidence to prove his assertions. The Court is of the opinion that the time available is well sufficient.

On December 17, 2018, the Petitioner filed a motion seeking subpoenas for the release of medical and other historical records of some of his family members. He also filed a motion for funding for another expert, Dr. James Merikangas, a neurologist and psychiatrist, to evaluate the Petitioner's mental health. In addition, the Petitioner filed a motion to compel the production of numerous records related to Judge Baumgartner from January 2007 to October 2009. Also on December 17, 2018, the Petitioner filed another motion to continue the evidentiary hearing. The court held an *ex parte* hearing on all of those motions on December 21, 2018. On December 31, 2018, the court denied each one by separate order.

As to the request for subpoenas related to the information about the Petitioner's family members, the court held that "[t]he motion . . . does not even suggest how the sought records might paint a bleaker (or more detailed) picture of [the Petitioner's] childhood than shown at trial" which "clearly showed . . . [it] to be one of violence, abuse, and neglect." The court found that the motion for funding for Dr. Merikangas did not sufficiently satisfy the threshold requirements of Rule 13. Acknowledging that Judge Baumgartner's opioid addiction during the several trials in this case was well-documented, the post-conviction court held that the issue as it related to Judge Baumgartner's alleged impairment during the

Petitioner's trial had previously been determined and, thus, there was no need to order the release of any records related thereto. *See Letalvis Cobbins, et al.*, No. E2012-00448-SC-R10-DD (order); *Davidson*, 509 S.W.3d at 227-29.

In a separate thirteen-page order, the post-conviction court also denied the Petitioner's request for a continuance. The Petitioner offered, as one reason in support of his request, the anticipated testimony of Thomas at Boyd's then-upcoming trial. As discussed below, the post-conviction court erroneously concluded that information was not relevant in the post-conviction proceeding. As to the other reasons offered, counsel asserted that "these post-conviction proceedings have been moving far faster than nearly all other capital post-conviction proceedings and that the issues associated with this case are more complex than the 'average' capital post-conviction case" and that "extensive investigation still needed to be undertaken, including the interview of over 100 potential witnesses." The court recited its duty to resolve the proceeding in a timely manner and noted counsel's insistence that "the time frames established by statute and court rule are merely directory, and should be ignored." The court stated:

> Were this Court to impose a lengthy continuance, the Court would not be in substantial compliance with the provisions of Rule 28 and section 40-30-111.
>
> The Court acknowledges its duty to afford the Petitioner the opportunity to present his claims in a meaningful time and manner. However, in so doing this Court must remain mindful of the time frames established by the General Assembly and the Tennessee Supreme Court regardless of how other trial courts have treated such provisions in the past or may do so in the future. This Court takes the one-year provision of section 40-30-111 seriously in scheduling matters, and that provision figures significantly in this Court's resolution of the current continuance motion.

The court then ruled:

> The Court notes post-conviction counsel's arguments concerning their other grounds for a continuance largely repeated those raised in earlier filings and at the October 2018 status conference. Those arguments and the Court's analysis regarding those arguments shall not be repeated here. However, the Court notes that at the hearing on the continuance motion, Mr. Watkins and Mr. Howell asserted that the OPCD needed more time to interview over 100 potential witnesses and examine the discovery in this case. Despite raising these assertions, counsel presented no evidence (in the form of witness testimony, affidavits, or otherwise) to support these assertions. As the Court of Criminal Appeals stated in *Harris*,

- 21 -

It is undisputed that a continuance may be granted for the purpose of securing the presence of identifiable witnesses if the witnesses' testimony is material and admissible. However, in this case, the appellant sought a continuance in order to gather information which, at the time of the motion, was largely unknown and of entirely speculative value.

[*Harris v. State*, 947 S.W.2d 156, 174 (Tenn. Crim. App. 1996)]. Counsel could have filed an affidavit or stated in their continuance motion the types of witnesses to be interviewed and the information they could have been expected to provide. Counsel's providing the Court with only the most general of information regarding the potential witnesses to be interviewed and investigation to be completed can only lead the Court to speculate as to whether the potential witnesses and evidence the OPCD hope to uncover would benefit the petitioner's case, assuming such witnesses and evidence are available at all. Just who these witnesses might be and how they might contribute to Petitioner's case is not clear to this Court.

Petitioner's counsel have officially had this case since early March 2018 and unofficially since December 2017, when they wrote the 24-page petition which initiated this case. The undersigned judge is very familiar with this case from his significant involvement in 2012 and 2013. It seems not credible that two competent lawyers with the resources of their office and those provided by the Court could not be ready for the scheduled hearing given their appointment over ten months before the hearing. Further delay of these proceedings is not warranted, nor is such delay necessary.

. . . .

The Court is confident that beginning the trial as scheduled in late January will give post-conviction counsel an opportunity to present [the Petitioner's] substantial claims in a reasonable time and manner. Petitioner's attorneys have not presented this Court with information to suggest that the hearing will be unfair to [the Petitioner] if it occurs as scheduled. Accordingly, Petitioner's motion for a continuance is DENIED.

In the meantime, on December 28, 2018, the Petitioner filed an application in this court for an extraordinary appeal. *See* Tenn. R. App. P. 10. The Petitioner sought review of the post-conviction court's "denial of sufficient time and resources necessary to effectuate due process and a full and fair hearing" on his petition. Specifically, the

Petitioner sought interlocutory review of the post-conviction court's scheduling orders, orders on the Petitioner's various requests for expert funding, and orders related to his requests for disclosure of records related to Judge Baumgartner and the Petitioner's family. Finding that the post-conviction court had not "'so far departed from the accepted and usual course of judicial proceedings as to require immediate review,'" this court denied the Petitioner's application on January 17, 2019. *Lemaricus Davidson v. State*, No. E2018-02294-CCA-R10-PD (Tenn. Crim. App. at Knoxville, Jan. 17, 2019) (order) (citing Tenn. R. App. P. 10(a)).

On January 3, 2019, the Petitioner renewed his request for funding for Dr. Merikangas. The court denied that motion on January 9, 2019. On January 7, 2019, the Petitioner filed a motion to bifurcate the evidentiary hearing due to Dr. Lipman's unavailability to appear as scheduled. The court denied the request to bifurcate the hearing, but offered the Petitioner several alternative means by which to introduce Dr. Lipman's testimony at the scheduled hearing. On January 9, 2019, the Petitioner filed petitions for writs of habeas corpus *ad testificandum* to secure the presence of codefendants Cobbins, Thomas, and Coleman at the evidentiary hearing as witnesses. The court denied those requests on January 10, 2019.

Both parties filed prehearing briefs. The Petitioner filed his twenty-one-page brief on January 18, 2019, and the State filed its brief on January 24, 2019. On the day of the scheduled hearing, January 28, 2019, counsel filed "Petitioner's Notice of Lack of Readiness for Evidentiary Hearing and Denial of Adequately Prepared Counsel." Counsel asserted that "[t]he amount of unfinished record collection, record review, and investigation render undersigned counsel unable to make an offer of proof of evidence that could be presented with the benefit of additional time and resources to perform the numerous tasks necessary to effectuate Petitioner's rights to due process and a full and fair hearing." The trial court held the evidentiary hearing, as scheduled, on January 28 and 29, 2019.

A. *Continuance*

The Post-Conviction Procedure Act governs the filing, processing, hearing, and disposition of petitions challenging the abridgment of any state or federal constitutional right. Tenn. Code Ann. §§ 40-30-101, et seq. In addition to time limits imposed upon a petitioner, the Act mandates that the post-conviction court proceed under certain deadlines. See Tenn. Code Ann. § 40-30-102. After the petition and answer are filed, the post-conviction must enter an order within thirty days scheduling the evidentiary hearing. Tenn. Code Ann. § 40-30-109(a). The hearing must occur within four months of the post-conviction court's scheduling order. Tenn. Code Ann. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). That "deadline shall not be extended by agreement, and the deadline may be

- 23 -

extended only by order of the court based upon a finding that unforeseeable circumstances render a continuance a manifest necessity. An extension shall not exceed sixty (60) days." Tenn. Crim. App. § 40-30-109(a); Tenn. Sup. Ct. R. 28, § 8(B). The Act further directs that "[t]he court shall rule within sixty (60) days of conclusion of proof." Tenn. Code Ann. § 40-30-111(d). That deadline also "shall not be extended by agreement, and the deadline may be extended only by order of the court based upon a finding that unforeseeable circumstances render a continuance a manifest necessity. An extension shall not exceed thirty (30) days." Tenn. Code Ann. § 40-30-111(d). Finally, as is specifically relevant to the Petitioner's issue in this appeal, and as reiterated by the post-conviction court throughout its rulings, "[f]inal disposition of a capital case must be made within one (1) year of the filing of the petition." *Id.*

A petitioner is entitled to an evidentiary hearing to prove his or her allegations of fact by clear and convincing evidence. Tenn. Code Ann. §§ 40-30-109, -110. The United States Supreme Court has held that the opportunity to be heard "at a meaningful time and in a meaningful manner" is a requirement of due process accorded to litigants. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Similarly, the Tennessee Supreme Court has held that the requirement of a "full and fair hearing" is satisfied when "a petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief." *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995).

The decision to grant or deny a continuance rests within the sound discretion of the trial court, and reviewing courts will not question that decision absent a showing of abuse of discretion. *State v. Hester*, 324 S.W.3d 1, 35 (2010). Our supreme court recently emphasized that the abuse of discretion standard of review is a "less rigorous review" of a trial court's decision and does not permit this court to "second-guess" the trial court or substitute its judgment for that of the trial court. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019). The supreme court further explained the standard of review:

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a [trial] court's discretionary

decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions.

*Id.* (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). "Accordingly, if the reviewing court determines that 'reasonable minds can disagree with the propriety of the decision,' the decision should be affirmed." *Id.* (citation omitted). Moreover, a petitioner seeking due process relief from the denial of a continuance bears the burden of establishing actual prejudice by demonstrating that the result of the proceeding would have been different had the request for a continuance been granted. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004).

The Petitioner presents a general theme that the post-conviction court's timeline for the post-conviction proceeding was unreasonable. He complains that he had inadequate time to investigate and present his claims for relief. As he correctly observes, post-conviction "counsel shall be required to review the pro se petition, file an amended petition asserting other claims which petitioner arguably has or a written notice that no amended petition will be filed, interview relevant witnesses, including petitioner and prior counsel, and diligently investigate and present all reasonable claims." Tenn. Sup. Ct. R. 28, § 6(C)(2).

As noted above, counsel assisted the Petitioner in the filing of his original *pro se* petition on December 4, 2017. That form petition checked-off typical grounds for post-conviction relief, such as ineffective assistance of counsel, and summarily highlighted counsel's "failure to pursue a change of venue due to extensive and highly prejudicial pretrial coverage of the case in the media." As recounted above, the post-conviction court granted the Petitioner at least two extensions of time to amend his petition and then permitted him to twice supplement that amendment. The amended petition, filed approximately nine months after the filing of the *pro se* petition, was one hundred fifty-six pages with almost fifty pages dedicated to issues surrounding pretrial publicity and jury selection. The first supplement, filed just over a month later, was thirty pages and discussed primarily the issues related to pretrial publicity and Thomas's anticipated testimony at Boyd's then-upcoming trial. The second supplement, filed one month before the evidentiary hearing, focused on an issue related to Judge Baumgartner. The Petitioner also filed a twenty-one-page prehearing brief. Again, the evidentiary hearing was originally scheduled for June 20, 2018, but was ultimately continued until January 28, 2019. As noted above, on the day of the hearing, the Petitioner filed a notice of "lack of readiness." The post-conviction court did not continue the hearing again but made the following comments in its final order regarding counsel's notice:

- 25 -

Counsel have failed on their motion to continue to bring to the Court's attention any specific witnesses it has failed to interview or any missing witness that might have any information about any valid claims in this case. Mere vagaries and speculation are insufficient to support a continuance. At no time did Counsel cite any information from interviews with the three (3) trial counsel, the mitigation specialist who testified at trial, the psychiatrist who testified at trial, or the neuropsychiatrist who examined the Petitioner prior to the 2009 trial. There is no indication that these participants in the trial preparation in 2008-09 were hostile, refused to be interviewed, or were unavailable for interviews.

If there were voids in trial counsel preparation in 2008-09 which would open the door for further expert testimony it was not shown to the Court.

. . . .

As to the continuance, the Court would have granted a continuance if there had been any showing to the Court that additional time was necessary to proceed on a substantive claim. After at least 43 weeks Counsel did not make such a showing. They could only present the Court with speculation and an expressed need to proceed on an exploratory investigation with no reasonable boundary and little relationship to the apparent real issues in the case. The motion to continue was appropriately denied and the Court is convinced that Petitioner's Counsel were able to well present proof at the hearing focused on the substantive issues in this case.

The extensive prehearing history of this proceeding has been outlined above. The post-conviction court cited to the relevant authority in support of, and explained in detail the reasons for, denying the Petitioner's requests for continuances. Nothing in the record demonstrates that the post-conviction court abused its discretion. The length of the amended petition, and the supplements thereto, alone demonstrate that counsel had ample time to prepare their case. The Petitioner makes a blanket argument in his appellate brief that because

post-conviction counsel failed to review or collect numerous documents (including those pertaining to his family members, his non-correctional medical history, his co-defendants' trial transcripts and technical records, his housing in juvenile facilities, his trial counsel's file, law enforcement investigative files and collected physical evidence, and the State's post-

- 26 -

conviction discovery) and failed to interview numerous witnesses (including family members, friends, neighbors, teachers, law enforcement agents, and social service providers), [the Petitioner] cannot illustrate the prejudice caused by the post-conviction court's denial of time and access to records.

The post-conviction court granted the Petitioner funding for investigative services on July 2, 2018, almost seven months before the evidentiary hearing occurred. In his brief, the Petitioner contends that the post-conviction court erred by denying his request, which he filed on December 17, 2018, just one month before the hearing, seeking subpoenas for the medial and historical records of his family members. As the State correctly notes, a petitioner may subpoena witnesses to testify at the evidentiary hearing. Tenn. Sup. Ct. R. 28, § 8(C)(3). Moreover, those witnesses may be subject to subpoenas duces tecum. *See Delvin Allison v. State*, No. W2017-00707-CCA-R3-PC, 2018 WL 2338219, at *5 (Tenn. Crim. App. at Jackson, May 23, 2018). Regardless, the Petitioner does not explain why he was unable to request any of that information in those intervening months. Counsel obviously met with the Petitioner at least no later than December 17, 2017, and presumably was familiar with the courts' opinions on direct appeal. Thus, post-conviction counsel could, or should, have learned almost immediately about the Petitioner's family. Indeed, in their amended petition filed on September 4, 2018, counsel alluded to the necessity for defense counsel in a capital case to generally investigate a defendant's background. Other than counsel's bare assertion that the post-conviction court denied them time to investigate the Petitioner's family's background, the record does not support counsel's claim. In their amended petition and supplements thereto, counsel did not reference any specific evidence about the Petitioner's family that trial counsel was unable to reveal. Moreover, the Petitioner did not call any of his family members as witnesses at the evidentiary hearing. The record simply does not support his claim on appeal that the trial court abused its discretion by denying, one month before the hearing, his motion for those subpoenas.

The Petitioner also argues on appeal that the post-conviction court erred by denying a similar request he made, also just one month before the hearing, for the production of records related to Judge Baumgartner. Evidence of Judge Baumgartner's addictions is referenced elsewhere in this opinion. As the post-conviction court properly ruled in denying the Petitioner's request for those records, any issue as it related to Judge Baumgartner's alleged impairment during the Petitioner's trial had previously been determined and, thus, there was no need to order the release of any records related thereto. *See Letalvis Cobbins, et al.*, No. E2012-00448-SC-R10-DD (order)*; Davidson*, 509 S.W.3d at 227-29. The court, however, afforded the Petitioner the opportunity to present

proof of any misconduct by the trial judge during trial, not previously shown, that should have been offered by trial counsel in their motion for new trial. This would include misstatements by the judge, failure to respond,

prejudicial statements, lapses of memory, slurred speech, confusion, sleeping on the bench, and failure to properly control the courtroom.

However, neither trial attorney testified during the hearing that he noticed any such misconduct. This court thus finds the post-conviction court did not abuse its discretion by denying the Petitioner access to the contested records in that respect.

The fact that counsel may have chosen to assign certain grounds for post-conviction relief higher priority than others does not equate with the denial of due process. As the post-conviction court suggested, it was only responsible for supervising the timely resolution of the petition, not overseeing the management of counsel's case. More than one year after the filing of the original petition and approximately four months after the filing of the amended petition, the proof at the evidentiary hearing focused almost primarily on two particular grounds for relief. Aside from his argument regarding the post-conviction court's management of the post-conviction proceeding, the Petitioner similarly dedicates the crux of his appellate brief to the pretrial publicity and jury selection issues. This court finds it highly unlikely, given the procedural history, that counsel did not have ample time to investigate and litigate all of their alleged grounds for relief. The post-conviction record in this appeal is large and includes extensive pre- and post-hearing filings by the Petitioner's attorneys. Despite its size, the record otherwise clearly demonstrates that the Petitioner was afforded ample opportunity to present and argue his alleged claims for relief within a meaningful time and in a meaningful manner. *See Mathews*, 424 U.S. at 333; *House*, 911 S.W.2d at 711. The Petitioner simply has failed to demonstrate to this court how he was denied a "full and fair" hearing as required by the law. We conclude that the post-conviction court did not abuse its discretion by denying the Petitioner's request for another continuance on the date of the scheduled hearing.

B. *Expert Services*

Tennessee Supreme Court Rule 13 governs funding for expert services for an indigent petitioner in a capital post-conviction proceeding. Tenn. Sup. Ct. R. 13, § 5. Pursuant to that Rule, the post-conviction court has the "discretion [to] determine [whether] investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. Tenn. Sup. Ct. R. 13, § 5(a)(1). A petitioner must satisfy certain "threshold requirements" in the motion seeking the funding. Tenn. Sup. Ct. R. 13, § 5(b). If the post-conviction court is satisfied that those requirements have been met, it must then conduct an *ex parte* hearing to determine if there is a "particularized need" for the services. Tenn. Sup. Ct. R. 13, § 5(c)(1). "Particularized need in the context of capital post-conviction proceedings is established when a petitioner shows, by reference to the particular facts and circumstances of the petitioner's case, that the services are necessary to establish a ground for post-conviction relief and that the

petitioner will be unable to establish that ground for post-conviction relief by other available evidence." Tenn. Sup. Ct. R. 13, § 5(c)(3) (citing *Owens v. State*, 908 S.W.2d 923, 928 (Tenn. 1995)). The Rule provides that a "particularized need" cannot be established when a motion contains only:

(A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Tenn. Sup. Ct. R. 13, § 5(c)(4). Because Rule 13 entrusts the decision of whether to grant funding for services to the sound discretion of the post-conviction court, this court reviews that decision under an abuse of discretion standard. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 517 (Tenn. 2013). That standard of review is detailed above. *See McCaleb*, 582 S.W.3d at 186.

### a. *Dr. Edelman and Mr. Levinson*

The Petitioner sought the assistance of Dr. Edelman and Mr. Levinson in support of their claim against trial counsel's decision to seat a jury in Knox County. Dr. Edelman, who lived in California, would have primarily researched, collected, and organized pretrial media coverage about the case, given an opinion about the effect of such coverage on the Knox County jury pool, and given an opinion about the efficacy of trial counsel's voir dire of the prospective jurors on the case's publicity. Mr. Levinson, who lived in Hawaii, would have given an opinion about how "implicit racial bias" might have affected the trial court proceedings and how trial counsel might have been ineffective in their voir dire of the potential jurors.

On appeal, the Petitioner asserts that he "established his need for these experts by supplying the post-conviction court with detailed information regarding the pretrial publicity in this case, with the empirical science underlying the experts' fields, and with how their specialized knowledge – outside the purview of laypeople – materially assisted in establishing post-conviction claims." As he states, "[H]e devoted over ten pages of one

- 29 -

motion to the extensive and pretrial publicity in this case, the surrounding community outrage and racist response, and his jury's exposure to the media coverage."

The post-conviction court explained its reasons for denying specific funding for Dr. Edelman and Mr. Levinson as follows:

> The Court disagrees with Petitioner's assertions as to the necessity of these proposed experts. The Court is aware that issues related to the extensive pretrial publicity in this case, the racial overtones of the case, and the potential for juror bias all loom large in the current post-conviction proceedings. The Court also recognizes the Petitioner should be given the opportunity to present these issues as this case progresses. However, the Court does not believe these proposed experts "are necessary to establish a ground for post-conviction relief and that the petitioner will be unable to establish that ground for post-conviction relief by other available evidence." Tenn. Sup. Ct. R. 13, § 5(c)(3).

> In this Court's view, the things necessary to establish the Petitioner's claims related to the publicity and jury selection issues are evidence of the publicity in this case and the relevant case law examining the issues identified in Petitioner's motion[s]. Regarding proof of pretrial publicity, this Court has no doubt that locating, organizing, and presenting evidence of the overwhelming media publicity and other Internet "noise" this case generated before Petitioner's trial will be a significant task. However, Petitioner does not need an "expert" to perform this task, let alone one well beyond the 150-mile radius established by Supreme Court Rule 13.

> Regarding the relevant case law, counsel for the Petitioner have identified in these motions several of the leading cases related to juror bias, pretrial publicity, and presumed juror prejudice. These cases will guide the Court in its resolution of Petitioner's claims for relief. The Court is also confident counsel will continue to provide the Court with relevant case law and other authority as this case continues. Finally, the Court notes it is well-qualified to address the Petitioner's stated issues based solely on the evidence Petitioner will present to the Court and the relevant case law. As stated at the July 26 hearing, the undersigned judge has presided over eight capital jury trials and approximately ten death penalty post-conviction cases. While none of these prior death penalty cases featured pretrial publicity as extensive as that generated in [the Petitioner's] case, this judge's experience in conducting capital case voir dire and his familiarity with the issues identified in Petitioner's motions are such that the Court would not be substantially

assisted by expert opinion as to these matters. The parties' presentation of the law and the facts will be sufficient for the Court to resolve these weighty issues. Trial judges are well capable of identifying and applying case law that recognizes those circumstances in which extensive pretrial publicity and/or racial animus (both direct and subtle), when overlooked during jury selection or otherwise, may deprive a defendant of a fair trial. As such, Petitioner's motions for the services of Mr. Levinson and Dr. Edelman are DENIED, as there is no particularized need for these experts' services.

Although it denied expert funding, the court authorized funding for the Petitioner to organize the enormous amount of media coverage about the trial which he ultimately was able to present during the hearing. The Petitioner does not explicitly challenge the post-conviction court's reasoning but instead argues that the denial of funding for the services of the two experts "prevented [him] from introducing evidence that would have *moved the needle* on this close issue and established his claims." (Emphasis added). The post-conviction court's ruling specifically explained how the Petitioner failed to show a particularized need for the services of the experts as it related to the presentation of the proof on pretrial publicity. In fact, the Petitioner was able to present an enormous amount of just such type of evidence. The general subject matter of the purported testimony of these two experts was not outside the "province or understanding" of the post-conviction court or the "capability and expertise" of counsel. Rule 13, § 5(c)(4). As the post-conviction court emphasized, these two experts "would not substantially assist the Court in resolving the[] weighty issues" surrounding pretrial publicity and jury selection. The Petitioner has failed to demonstrate how the trial court's actions prejudiced the presentation of his case in any way. The post-conviction court did not abuse its discretion by denying funding for these two experts.

### b. *Drs. Auble and Merikangas*

The Petitioner sought the assistance of these Drs. Auble and Merikangas in support of their claim against trial counsel's presentation of mitigating evidence during sentencing. The Petitioner sought the assistance of Dr. Auble to essentially challenge the testimony of Dr. Brown, the Petitioner's mitigation expert. The Petitioner asserted that "Dr. Auble's neuropsychological opinion supported the claim that trial counsel rendered ineffective assistance in failing to properly consult with their mental health experts and supervise [the] mitigation presentation." As to Dr. Merikangas, the Petitioner asserted that a "neurologist's testimony would support a claim of ineffective assistance of counsel by *potentially* showing the prejudice from trial counsel's oversight" for failing to seek further neurological or psychiatric testing. (Emphasis added.) On appeal, the Petitioner argues that the post-conviction court inappropriately denied funding for these two experts by requiring "documents and interviews . . . proving that his trial counsel had rendered

- 31 -

ineffective assistance of counsel by failing to properly communicate, prepare, and supervise their experts and to request the services of a neurologist."

In the post-conviction court's August 2, 2018 order, the court offered the following reasons for denying the Petitioner's initial request for Dr. Auble's services:

> In his motion, Petitioner states, "The facts of [his] case require a neuropsychologist to establish a claim of ineffective assistance of counsel in failing to adequately present evidence of brain dysfunction during sentencing." Much of the Petitioner's argument is spent assailing trial counsel's chosen expert:
>
> > Trial counsel did not present neuropsychological testimony to [the Petitioner's] jury. Unfortunately for [the Petitioner], counsel instead presented testimony of psychiatrist Peter Brown. Though ostensibly an expert witness for his case in mitigation, it is more likely that the impact of Dr. Brown's testimony was aggravating and supportive of the State's case for death. Dr. Brown mentioned that [the Petitioner] was referred for a neuropsychological evaluation but did not testify to the details of who conducted the evaluation, the credentials of the evaluator, or the neuropsychological tests that were conducted. Instead, he stated, without adequate qualification or explanation, that these tests were all within normal ranges. It is unclear who held the opinion of "normal ranges," Dr. Brown or the unnamed evaluator. Considering the predictors for neurological dysfunction in [the Petitioner's] childhood, this seemingly unqualified testimony casts doubt on Dr. Brown's opinion of neurological normalcy.
> >
> > Moreover, of great concern is the testimony of Dr. Brown, who is not a neuropsychologist or an expert in intellectual disability or functioning, that from "psychiatric and psychological testing," [the Petitioner] had an average IQ and "probably above average IQ, just low results because of educational limitations." Dr. Brown did not explain who conducted what tests and under what circumstances. Worse, he did not divulge the scientific basis behind his feeling that [the Petitioner] had an "above average IQ" not otherwise shown in presumably standardized, normed tests. The

proposition that education or academic performance drives IQ score is, at best, not widely held.

In this post-conviction proceeding, undersigned counsel must consult with a neuropsychologist 1) to assist in determining if prior counsel acted reasonably and in conformity with legal norms in providing records and requests to their experts; 2) to evaluate any prior testing for potential errors in administration or scoring; 3) to advise counsel on whether the testing previously administered was adequate or whether other tests should have been administered; 4) to determine whether the prior testing may have shown areas of impairment the significance of which the evaluator or Dr. Brown missed, and 5) to conduct further testing if warranted.

Having presided over numerous death penalty trial and post-conviction proceedings, this Court is well aware that neuropsychological testing is often part of the mitigation case investigated and presented by a capital defense team. However, the Court must also recognize this opinion of the Tennessee Court of Criminal Appeals in the direct appeal of a capital post-conviction case:

The Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick [v. State]*, 454 S.W.3d [450,] 475 [(Tenn. 2015)]. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choice[]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. [263, 275] (2014) (quoting *Strickland*, 466 U.S. at 690); *see Kendrick*, 454 S.W.3d at 474.

. . . .

[Furthermore,] we note that the United States Supreme Court has rejected a claim of ineffective assistance of counsel consisting of "the hiring of an expert who, though qualified, was not qualified enough." *Hinton*, 571 U.S. at [274-75]. The Court declined to "launch federal courts into examination of

- 33 -

the relative qualifications of experts hired and experts that might have been hired." *Id.*

*David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at \*58, \*62 (Tenn. Crim. App, Oct. 14, 2016), *perm. app. denied*, (Tenn. July 19, 2017). This Court also notes that in another death penalty post-conviction case, the Court of Criminal Appels concluded that in most circumstances, "A defense attorney is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at \*54 (Tenn. Crim. App. Apr. 25, 2011), *perm. app. denied*, (Tenn. Nov. 15, 2011).

At this point, this Court has not been presented any evidence regarding the substance of the proof Dr. Brown was presented during his evaluations or the nature of his conclusions. For instance, the Court notes counsel for the Petitioner challenge Dr. Brown's finding that [the Petitioner's] "neuropsychological evaluation was normal," but counsel has not presented any specific argument explaining why or how such conclusions could have been inaccurate. Counsel for the Petitioner also stated they have not reviewed Dr. Brown's report or the materials upon which he based his conclusions, nor have they interviewed Dr. Brown. Absent such proof, the Court has no way of knowing whether Dr. Brown, or trial counsel, could have or should have developed different psychological or other mental health-based mitigation evidence.

Accordingly, in light of the current state of affairs surrounding this request, this Court must conclude the motion does not state a particularized need for Dr. Auble's services. Absent any evidence regarding Dr. Brown's work, the motion for services constitutes something that could be considered either "undeveloped or conclusory assertions that such services would be beneficial" or "assertions establishing only the mere hope or suspicion that favorable evidence may be obtained." Such assertions do not establish particularized need, nor do they require this Court deviate from the precedent established in *Hinton, Jordan, Pike*, and related cases. As such, the motion for Dr. Auble's services is DENIED at this time. [Footnotes omitted.]

In the order filed on September 17, 2018, denying the Petitioner's renewed motion for the services of Dr. Auble, the post-conviction court stated:

The Petitioner now asserts that the testimony that his neuropsychological evaluation was normal was not only incorrect but that

- 34 -

his trial counsel, if they had complied with professional standards, should have known it was incorrect. Petitioner's attorneys allege his neuropsychological evaluation was far from normal. Dr. Brown had referred Mr. Davidson to a neuropsychologist, Malcolm Spica, Ph.D., who had done the testing and evaluation.

At the September 12, 2018 *ex parte* hearing, Petitioner's Counsel stated that he was no longer asserting trial counsel selected unqualified experts or the wrong experts. Counsel also conceded that Petitioner's Counsel have yet to interview Dr. Brown or neuropsychologist Spica. They have also not interviewed trial counsel. Therefore the Court was not informed what Dr. Spica may have communicated to Dr. Brown nor has the Court been informed as to communications and inquiry by trial counsel with Dr. Spica and/or Dr. Brown. There is no factual assertion that Mr. Davidson failed to cooperate during his evaluations nor any assertion that trial counsel failed to provide the experts with necessary information.

At issue is the information contained in Pamela Auble's affidavit attached to the motion now before the Court. She states that after evaluating Dr. Spica's test data there was much information indicating that Mr. Davidson was far from "normal."

Dr. Auble has received the test data that Dr. Spica relied upon and on which Dr. Brown, in turn, relied upon in his trial testimony. Dr. Spica did not testify at the trial. The Auble affidavit then states:

> 5. From my review of these data, the effort testing indicated that Mr. Davidson put forth adequate effort on the testing so it would be considered valid. Mr. Davidson had some strengths on the testing. His overall IQ was average (50th percentile), his memory for visual information was above average (95th percentile), and his speed in doing simple, repetitive tasks was average. However, he also had some significant cognitive weaknesses. Mr. Davidson very likely has a learning disability in reading, written language, and/or math which would have limited his success in school, and could have been used for mitigation. His reading was at the 12th percentile, spelling was in the 2nd percentile, and arithmetic was in the 13th percentile. These scores are significantly below what would be expected from someone of average intelligence.

6. Second, Mr. Davidson had difficult[y] in situations in which he had to organize or manipulate information in order to solve problems. For instance, his copy of a complex design was only between the 2nd and 5th percentiles. His ability to arrange block designs to match a copy was relatively poor given the other visual tasks on the intelligence test (16th percentile). His ability to repeat digit strings in reverse order was much worse than his ability to repeat them in the same order (6 forward, only 3 backward). He was slow in alternating between counting and reciting the alphabet (5th percentile). When his memory was tested, he was normal at remembering meaningful stories, but when he had to relate pairs of words together to recall them, his memory deteriorated (50th percentile vs. 5th percentile).

7. This difficulty putting information together in ways that it can be effectively used likely had an impact on his ability to manage his life effectively and could have affected his behavior at the time of the offense. Thus, [this] is also information that could have been used in mitigation.

8. Dr. Spica did not do basic testing of language or speech, but given the evidence of learning disability, there could be abnormalities in these areas. Such abnormalities would also have a negative impact on Mr. Davidson's adjustment.

Given that Petitioner's Counsel has not interviewed Dr. Brown, Dr. Spica or trial counsel, we do not know what Dr. Brown knew or how trial counsel communicated with experts. It remains to be seen at the hearing in this case whether trial counsel should have known about this information and why it was not presented.

Petitioner's Counsel indicated that both Dr. Brown and Dr. Spica would be called to testify at the trial in this case. Dr. Auble is simply not needed. She would add little to what appears already apparent. The Court assumes that Dr. Spica can testify about these results since they come from his own testing. Thus there is no particularized need for Dr. Auble. Dr. Spica can provide the Court with this asserted "missing" information when he testifies. With this information in the record the Court can determine if trial

counsel were derelict in not knowing about these results and then failing to present these results, and then whether the absence of this information was prejudicial.

Based on the above reasoning, the Court sees no prejudice to the Petitioner by denying funding for Dr. Auble. The motion is denied.

In its order filed on September 19, 2018, which denied the Petitioner's "supplemental" motion, the court stated:

[T]his supplemental motion states for the first time that Dr. Lipman (the neuropharmacologist authorized in the July 31, 2018 Order . . .) says he needs a neuropsychologist, especially Dr. Auble, to assist him. The Court went back and read the July 20, 2018 sixteen (16) page motion in support of the request for Dr. Lipman. It is asserted that Dr. Lipman is necessary "to establish claims of ineffectiveness for failing to present evidence of diminished capacity at trial, failing to provide mitigating testimony of how [the Petitioner's] substance abuse affected his cognition generally and during the offense, and failing to establish credible evidence of Judge Baumgartner's impairment at trial."

Nothing in this July 20, 2018 motion nor the order of the Court granting the motion suggests that authorizing payment to Dr. Lipman means that the Court must also approve Dr. Auble or any other neuropsychologist nor that appointing a neuropsychologist was necessary for Dr. Lipman to opine on the impact of alcohol or drug use on the petitioner in January 2007 (the date of the crime).

If Dr. Lipman needs information about the neuropsychological testing related to the Petitioner's mental status in 2007, Dr. Lipman is free to consult with Dr. Spica. He is also the beneficiary of Dr. Auble's detailed affidavit attached to the Petitioner's July 31, 2018 motion to reconsider, containing her reading of the Dr. Spica 2009 testing. See TRE 703 and Cohen et al., *Tennessee Law of Evidence* § 7.03[4] and [5] (6th ed. 2011). Thus, access to the 2009 neuropsychological testing is available to Dr. Lipman and there is no particularized need shown for further testing.

Contrary to the Petitioner's contention, the post-conviction court did not utilize an incorrect standard in analyzing whether the Petitioner demonstrated a particularized need for the services of Drs. Auble and Merikangas. The court's orders specifically demonstrate

- 37 -

that it followed the guidelines set forth in Rule 13. Moreover, the court's reasoning was reasonable in reference to the particular facts and circumstances of the Petitioner's case.

As to the denial of funding for Dr. Auble, the post-conviction court found that the intent of the Petitioner's request for her services was to challenge the opinion and testimony of trial counsel's chosen expert. Both trial attorneys testified that they noticed nothing abnormal about the Petitioner's behavior. Both found him to be intelligent and capable of understanding the content of their discussions regarding the defense of his case. Moreover, as the post-conviction court found in its second order denying funding for Dr. Auble, "There is no factual assertion that [the Petitioner] failed to cooperate during his evaluations nor any assertion that trial counsel failed to provide the experts with necessary information." The court also noted that "[i]t remains to be seen at the hearing in this case whether trial counsel should have known about this information and why it was not presented." Although the Petitioner was evaluated by a psychiatrist, who in turn referred him to a neuropsychologist for additional testing, post-conviction counsel did not directly question trial counsel about their decision not to seek further mental health evaluations. *See William Glenn Rogers v. State*, No, M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *58 (Tenn. Crim. App. at Nashville, Aug. 30, 2012). It is evident, though, that trial counsel relied upon the opinion of their chosen expert, and also upon their own impressions after meeting with the Petitioner "dozens" of times, in deciding not to further investigate the Petitioner's mental health. The Petitioner failed to call either Dr. Brown or Dr. Spica as witnesses at the evidentiary hearing despite informing the post-conviction court they would during one of the hearings on the request for funding for Dr. Auble. To that end, in concluding that the Petitioner failed to show a particularized need, the court found, "Dr. Auble is simply not needed. She would add little to what appears apparent already." The mere hope or suspicion that Dr. Auble's evaluation would reveal any favorable evidence beyond what trial counsel already possessed does not create a particularized need for funding for her services in the Petitioner's post-conviction pursuit of an ineffective assistance of counsel claim. Tenn. R. Sup. Ct. 13, § 5(c)(4)(B). As the post-conviction court correctly observed:

> While there may be some cases where the only reasonable defense strategy involves consultation with experts or introduction of expert testimony, there are "'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" *Harrington v. Richter*, 562 U.S. 86, 106-07 (2011) (quoting *Strickland*, 466 U.S. at 689). Cases rarely exist in which the "'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id*. (quoting *Strickland*, 466 U.S. at 689). The Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes

one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick*, 454 S.W.3d at 475. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. ---, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690); *see Kendrick*, 454 S.W.3d at 474.

*David Lynn Jordan*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *58. Moreover, a defense attorney "is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54.

Upon review, this court concludes that the post-conviction court did not abuse its discretion by denying funding for Dr. Auble. In making its decision, the post-conviction court clearly considered "the applicable law" and took "the relevant facts into account." *McCaleb*, 582 S.W.3d at 179. The court did not "stray[] beyond the applicable legal standards" or "fail[] to properly consider the factors customarily used to guide" its decision." *Id.* This court will not "second-guess" the post-conviction court's decision in that respect.

Approximately one month before the evidentiary hearing, the Petitioner filed his first motion seeking the services of Dr. Merikangas to determine whether the Petitioner suffered from an organic brain injury. Noting that the motion was filed well-beyond the July 20, 2018, deadline it had set for motions seeking funding for expert services, the post-conviction court denied the motion because it did not satisfy Rule 13's threshold requirements. In its January 9, 2019, order denying the Petitioner's renewed motion for funding for Dr. Merikangas, the court initially noted, "At this late date Petitioner's attorneys wish to explore the possibility that [the Petitioner] suffers from a brain injury or other neurocognitive d[y]sfunction. These claims are based on an asserted history of head trauma during [the Petitioner's] childhood." The court recalled that trial counsel hired a mitigation specialist and a mental health expert to explore any possible brain dysfunction. As discussed previously, Dr. Brown testified during the sentencing hearing that the Petitioner's intelligence level was above-average and his neuropsychological evaluation was normal. During Dr. Brown's trial testimony, in which he relied, in part, on Dr. Spica's neuropsychological test results, he stated that there was no evidence of any mental disorders or history of organic brain injuries that were normally associated with violent criminal behavior. The post-conviction court offered the following additional observations before explaining the reasons for denying funding for Dr. Merikangas:

In addition to counsel's arguments as to why the motion should be granted (see below), the motion includes two affidavits. One affidavit was completed January 3, 2019, by Post-Conviction Defender's Office investigator Elizabeth Redwine. In the affidavit, Ms. Redwine states that in November and December 2018, unnamed relatives of the Petitioner informed her: (1) Petitioner's mother had been diagnosed with Fetal Alcohol Syndrome; (2) As a Child, Petitioner suffered two head injuries and exhibited poor motor skills, bed-wetting, and a weakened immune system; and (3) Petitioner had a "history of observable dissociative episodes."

The second affidavit was completed by Dr. Pamela Auble, a clinical psychologist, in August 2018. Dr. Auble's affidavit makes several claims which appear to contradict Dr. Brown's testimony. For instance, after stating she reviewed the testing data as completed by Dr. Malcom Spica, the psychologist with whom Dr. Brown conferred before trial, Dr. Auble writes, "Dr. Spica was never asked to write a report of his findings by the trial attorneys. . . . Dr. Peter Brown testified that there were no abnormalities on the neuropsychological testing from Dr. Brown's conversation with Dr. Spica, but Dr. Spica did not testify at the trial." [The court then quoted further from Dr. Auble's affidavit, which is detailed above.]

. . . .

Counsel for the Petitioner argue [he] is entitled to Dr. Merikangas's services for the following reasons:

It is deficient performance to delegate strategic-decision regarding the presentation of mitigation to mental health experts. *Foust v. Houk*, 655 F.3d 524, 536 (6th Cir. 2011). Trial counsel have an on-going duty to supervise the mitigation team, including their expert witnesses. *Id.*; *see also Chatman v. Walker*, 297 Ga. 191, 202 (2015) (finding counsel's performance deficient for delegating responsibility of mitigation investigation).

[The Petitioner] has met his burden in establishing his particularized need for Dr. Merikangas's services. [The Petitioner] raises claims related to ineffective assistance of counsel[,] specifically related to the preparation and supervision of the mental health expert presented at trial, as well as the failure to present mitigating evidence available to

- 40 -

trial counsel. These claims pertain to trial counsel's (1) failure to adequately consult with experts; (2) failure to provide experts with information critical to their evaluations; (3) failure to work with their experts in developing mitigation evidence; (4) failure to properly supervise their mitigation team, including expert witnesses, and ([5]) failure to fully present a compelling case for life during the penalty phase. *See* Am. Pet. [The Petitioner] . . . also raises a claim of ineffective assistance of counsel for failure to investigate or otherwise pursue a diminished capacity defense. *Id.*

Here, post-conviction counsel has discovered information relevant to [the Petitioner's] neurological and psychiatric functioning not developed or presented at trial. As [the Petitioner's] prior counsel deficiently failed to uncover this mitigating evidence, they did not tender it to their expert in anticipation of his trial testimony. As such, no neurological testing occurred before trial. Lacking basic neurological testing and a full record of information relevant to psychiatric assessments, the psychiatrist at trial did not present the whole picture of [the Petitioner's] functioning.

[The Petitioner] needs Dr. Merikangas' services in order to conduct this basic neurological testing, as indicated by information uncovered during the post-conviction investigation.

[The Petitioner] also needs Dr. Merikangas' services to perform a psychiatric evaluation that incorporates all information relevant to such an assessment. Due to prior counsel's ineffective investigation, an adequate psychiatric evaluation has not been previously been performed. [The Petitioner] cannot establish this claim without his own expert's testimony.

. . . .

[T]he Court is not convinced Petitioner has established particularized need for Dr. Merikangas's services. In support of their assertion testing is necessary because Drs. Brown and Spica did not perform adequate testing, counsel for the [P]etitioner have attached two affidavits: one by an

- 41 -

investigator and one completed by Dr. Auble. The affidavit completed by the investigator states the Petitioner's family members have informed the investigator that the Petitioner, as a child, suffered from two brain injuries and was also seen as "sickly" and suffering from enuresis and reduced motor skills. Trial counsel's mitigation specialist, Ms. Andrews, testified at the penalty phase of [the] trial regarding one episode in which [the Petitioner] was "knocked out" after being hit in the head during a fight which occurred when Petitioner was an adolescent. The other episodes referenced by Petitioner's post-conviction investigator were not explicitly referenced during the testimony of Ms. Andrews and the other family members who testified on Petitioner's behalf, but the Court is not convinced that these facts, even if newly discovered, would create the need for the testing Petitioner currently seeks.

Petitioner appears to base his assertions regarding the incorrectness of the findings of Drs. Brown and Spica on the affidavit of Dr. Auble. At first glance, the figures cited in Dr. Auble's affidavit appear to contradict Dr. Brown's testimony in which he claimed the results of his (and Dr. Spica's) various tests on the Petitioner were within "normal" ranges. However, Petitioner's motion leaves many relevant questions unanswered. Dr. Brown's report and the test data generated by Dr. Spica were not introduced into evidence at trial, and they also have not been submitted to this Court at any time during these proceedings. Thus, the Court has no way of knowing what tests were performed on Petitioner before trial and whether Petitioner's test results were normal (as Dr. Brown testified at trial) or below average (as counsel for the Petitioner, aided by Dr. Auble, assert). This Court also has no evidence before it regarding whether trial counsel were aware of the test results at the time of trial. This Court does not know whether counsel asked to review the test results or if Drs. Brown and Spica spoke to trial counsel at all regarding the test results. Absent such evidence, the Court must conclude that Petitioner has only presented the forth [sic] with the "mere hope or suspicion" that Dr. Merikangas's testing would reach conclusions other than those put forth at trial: namely, that Dr. Brown evaluated Petitioner - an evaluation which included review of past records, original testing by both Dr. Brown and Dr. Spica, and an interview with [the Petitioner] - and Dr. Brown found Petitioner to be of average or above-average intelligence. Furthermore, as stated above, Dr. Brown found no proof [the Petitioner] suffered from psychological disorder or organic brain injury. Furthermore, the Court notes there is no information in the record suggesting Drs. Brown and Spica, trial attorneys Doug Trant and David Eldridge, and trial mitigation specialist Rosalind Andrews would be unwilling or unable to speak with

post-conviction counsel and provide them with any information necessary to advance Petitioner's interests in the upcoming hearing - including the information which would be necessary to address the unresolved questions in the present motion. Thus, information which is available to [P]etitioner's counsel and directly pertinent to the issue asserted in this motion has not been provided to the Court.

The post-conviction court granted the Petitioner investigative services in the beginning of July 2018, but the Petitioner did not request the services of Dr. Merikangas until counsel learned about information from unidentified family members just a month or so before the evidentiary hearing. As the post-conviction court stated, some of that information was already known to trial counsel from their pretrial trial investigation. Again, trial counsel testified that they saw no evidence of impairment. Likewise, trial counsel's chosen expert testified that the Petitioner had a normal brain. Dr. Brown's testimony was based upon his evaluation as well as that of Dr. Spica. The mere hope that Dr. Merikangas would reach a different conclusion does not establish a particularized need in support of a claim of ineffective assistance of counsel in that respect. *See David Lynn Jordan*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *61; *Christa Gail Pike*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54.

This court concludes that the post-conviction court did not abuse its discretion by denying funding for Dr. Merikangas. Again, in making its decision, the post-conviction court clearly considered "the applicable law" and took "the relevant facts into account." *McCaleb*, 582 S.W.3d at 179. The court did not "stray[] beyond the applicable legal standards" or "fail[] to properly consider the factors customarily used to guide" its decision." *Id.* Again, this court cannot "second-guess" the post-conviction court's decision in that respect.

The post-conviction court offered insightful and reasonable explanations for its actions on each of the *ex parte* motions filed by the Petitioner. The Petitioner has failed to demonstrate how the post-conviction court's actions as to funding prejudiced the presentation of his case in any way. As our supreme court cautioned in *Owens*, a trial court's authority to authorize funding for expert services in capital post-conviction cases should not be interpreted as a "blank check." 908 S.W.2d at 923. The post-conviction court appropriately denied those services for which it concluded that the Petitioner had failed to establish a particularized need.

C. *Thomas Testimony*

The Petitioner next argues that the post-conviction court erred by denying him the opportunity to present evidence of Thomas's anticipated testimony at Boyd's then-

upcoming state trial. In the supplemental amended petition he filed on October 18, 2018, the Petitioner asserted that the State had recently informed counsel that Thomas had agreed to testify in Boyd's trial in exchange for post-conviction relief "where Thomas would serve fifty years in prison with eligibility for release after serving eighty-five percent of that sentence." The State further informed counsel that "Thomas would testify in the upcoming trial that Boyd killed Mr. Newsom and set his body on fire. Thomas would also testify that [the Petitioner] was not present when this occurred." Boyd's trial was originally scheduled for January 3, 2019, but was ultimately continued until August 2019. In support of his request for a continuance of the post-conviction evidentiary hearing, the Petitioner argued that he should be allowed to present the Thomas testimony in support of the Eighth Amendment ground for relief he asserted in his amended post-conviction petition. That ground alleged that the Petitioner was "innocent of the death penalty" because the proposed Thomas testimony would invalidate one of the aggravating circumstances, i.e., that the Petitioner knowingly mutilated Mr. Newsom's body after his death. *See Sochor v. Florida*, 504 U.S. 527, 532 (1992) (acknowledging "Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence"). Although the Petitioner stated that he could anticipate the general substance of Thomas's testimony, he could not know in detail the actual extent of that testimony until after Boyd's trial.

The post-conviction court denied the Petitioner's request to continue. Although the State agreed to stipulate to the anticipated content of Thomas's testimony, the Petitioner again asserted that such a stipulation would be insufficient without knowing the actual content of the testimony. According to the post-conviction court, however, the Petitioner's claim that he was innocent of the death penalty was not cognizable in a post-conviction proceeding. Citing a recent opinion from this court, the post-conviction court noted that claims of actual innocence based on newly discovered "non-scientific" evidence were not proper for post-conviction review. *See Marlon Duane Kiser v. State*, No. E2016-01644-CCA-R3-PD, 2017 WL 6549893, at *19 (Tenn. Crim. App. at Knoxville, Dec. 21, 2017). However, the *Marlon Duane Kiser* opinion was addressing a claim of actual innocence of the murder itself. *Id.* In this case, the Petitioner advanced a cognizable challenge under the Eighth Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution alleging that the imposition of the death penalty in light of the invalid aggravating circumstance represented cruel and unusual punishment. Thus, the post-conviction court's reasoning was erroneous. *Johnson v. Mississippi*, 486 U.S. 578 (1988) (addressing Eighth Amendment violation based on invalid aggravator in post-conviction context).

Regardless, the Petitioner is unable to demonstrate prejudice resulting from the post-conviction court's denial of his request for a continuance based on Thomas's anticipated

testimony. Again, the Petitioner ultimately sought error coram nobis relief based on that testimony, and this court will address the coram nobis court's ruling later in this opinion.

The United States Supreme Court recently issued its opinion in *McKinney v. Arizona*, 140 S. Ct. 702 (2020). Therein, the Supreme Court considered whether a reviewing court could reweigh the sentencing factors in a capital case when either an aggravating circumstance was improperly considered or a mitigating circumstance was improperly excluded. *Id.* The Supreme Court reiterated its holding in *Clemons v. Mississippi*, 494 U.S. 738 (1990), which permits "a state appellate court [to] uphold[] a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *McKinney*, 140 S. Ct at 706. The Supreme Court further held that "[t]here is no good reason . . . why state courts may not likewise conduct a *Clemons* reweighing on collateral review." *Id.* at 709. *See Barber v. State*, 889 S.W.2d 185 (Tenn. 1994) (citing *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993) (discussing application of harmless error analysis in both post-conviction and direct appeal context upon finding of invalid aggravating circumstance)).

In light of the Thomas testimony at Boyd's trial, the State concedes that application of the (i)(13) aggravating circumstance, that "[t]he defendant knowingly mutilated the body of the victim after death," was not supported by the trial evidence and could not otherwise be applied vicariously to the Petitioner. *See Johnson v. State*, 38 S.W.3d 52, 63 (Tenn. 2001) (aggravating circumstance focusing on defendant's actions and intent, rather than circumstances of killing, could not be applied vicariously). Again, the Petitioner properly raised a constitutional claim regarding the invalidity of that aggravating circumstance in his amended petition. Thus, a harmless error analysis must be undertaken to determine its effect on the death sentence as applied to the murder of Mr. Newsom.

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*Howell*, 868 S.W.2d at 260-61. This court must conclude "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid . . . aggravating factor." *Id.* at 262.

The jury found three other aggravating circumstances applied to the murder of Mr. Newsom: the murder was especially heinous, atrocious, or cruel; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest; and the murder was committed during the perpetration of a felony. Tenn. Code Ann. § 39-13-204(i)(5), (6), (7). Significantly, in the context of post-conviction relief, the Petitioner does "not allege that this new evidence called into question his conviction for the murder of Mr. Newsom." He does advance such a claim in support of his request for error coram nobis relief, which we will address later in this opinion. The Petitioner also does not contest that the remaining three aggravating circumstances can be applied vicariously against him. The (i)(5), (6), and (7) aggravators, "by their plain language, clearly encompass consideration of the *nature and circumstances of the crime itself*." *Johnson*, 38 S.W.3d at 62 (quoting *Owens v. State*, 13 S.W.3d 742, 763 (Tenn. Crim. App. 1999)) (emphasis in original). "The emphasis in the (i)(5)[, (6), and (7)] aggravator[s] is on the *manner of killing*, not on the defendant's actual participation." *Id.* (emphasis in original).

In his post-conviction brief, the Petitioner merely argues that "had jurors known that Eric Boyd, not [the Petitioner], was responsible for the conduct supporting them, they would have given those [aggravating] circumstances less weight than the weight they attributed them under a false belief that [the Petitioner] killed Mr. Newsom and set his body on fire." He also asserts that "[t]he same evidence was presented to the juries of [his] codefendants, including evidence of the aggravating circumstances that could be applied vicariously, and none of them were sentenced to death." However, the juries' verdicts in the codefendants' trials have no bearing on our harmless error analysis. Moreover, the invalid aggravator does not affect the sentence imposed for Ms. Christian's murder because that aggravating circumstance applied only to Mr. Newsom's murder.

On direct appeal, our supreme court summarized the evidence supporting the aggravating circumstances. As to the heinous, atrocious, and cruel circumstance, that court observed:

> The State's proof showed that Chris was robbed at gunpoint and taken against his will to a place where he was anally raped with sufficient force to injure his anus. After being raped, he was forced to walk without shoes, socks, and pants to a desolate area beside a set of train tracks. Chris was blindfolded with a bandana, his sock was forced in his mouth and tied with a shoelace, and his head wrapped in a sweatshirt. His ankles were bound by his belt and a strip of fabric, and his wrists were tied behind his back. He was shot three times - in his lower back, his neck, and his head. The trajectory of the bullet to his back indicated he was bent over when the shot was fired. The contact shot to his head was fatal. He had a hematoma in the

right forehead region, indicating blunt force trauma possibly resulting from his fall to the ground after being shot. Chris had no defensive wounds because, according to the medical examiner, he could not defend himself.

509 S.W.3d at 220. The court held that "[w]ithout question," the murder of Mr. Newsom was "especially heinous, atrocious, or cruel and clearly involved torture and serious physical abuse beyond that necessary to produce death. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance." As to the (i)(6) aggravator, the court stated:

> The State's proof showed that Chris and Channon were forcibly abducted from the Washington Ridge Apartments, robbed, and taken in Channon's vehicle to [the Petitioner's] house. Chris and Channon were witnesses to the robbery and kidnapping. [The Petitioner] was determined to avoid detection. Chris and Channon were murdered, the stolen vehicle was "wiped down" to remove fingerprints, identifying decals were removed from it, bleach was sprayed into Channon's mouth to attempt to destroy DNA, gasoline was poured on Chris's body and set on fire in an apparent attempt to hide his identity and destroy DNA, and Channon's body was hidden in a garbage can. In his statement to police, [the Petitioner] admitted he had expressed concern to Mr. Cobbins that Channon had been brought into the house after the carjacking without a blindfold and had seen them.
>
> The evidence fully supports the conclusion that the murders of Chris and Channon were committed to avoid [the Petitioner's] arrest or prosecution for robbery and kidnapping. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

*Id.* at 221. Finally, as to the (i)(7) aggravating circumstance, the court noted that

> [b]esides the murder convictions, [the Petitioner] was convicted of two counts of especially aggravated robbery, two counts of especially aggravated kidnapping, three counts of aggravated rape of Channon, and one count of facilitation of aggravated rape of Chris. The murders of Chris and Channon occurred in relation to [the Petitioner's] commission of especially aggravated robbery, especially aggravated kidnapping, aggravated rape, and facilitation of aggravated rape. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

*Id.* Our supreme court also summarized the mitigating proof as follows:

- 47 -

From this evidence, it appears that [the Petitioner] had a difficult childhood due to a neglectful, drug-addicted, abusive mother and an absent father. He had numerous adverse childhood experiences that predisposed him to committing violent acts as an adult. [The Petitioner], however, was given opportunities to better himself. He had above-average intelligence and no apparent psychological issues. He was removed from his mother's abusive home and began living at the [West Tennessee] Children's Home. Ms. [Alice] Rhea and Mr. [Jason] Bramblett at the Children's Home took an interest in him and encouraged and supported him. After [the Petitioner] left the Children's Home, Mr. and Mrs. [Carl] Rudd took him into their home and treated him as one of their own children. He attended a private high school, was provided tutoring assistance, went to church, played football, and had friends and a supportive foster family. Yet, he violated Mr. and Mrs. Rudd's rule on drug use - not once but twice - and [the Petitioner] had to leave their home. Even then, a coach at [the Petitioner's] school gave him a place to live until he could get a job and find housing. Despite this support and assistance, [the Petitioner], at the age of nineteen, committed aggravated robbery and carjacking and was incarcerated. [The Petitioner] had a chaotic and unstable childhood, but as an adult, he had choices. Unfortunately, he made bad choices.

*Id.* at 223. As to the State's opening remarks during the sentencing phase of the trial, the prosecuting attorney devoted little argument to the invalid aggravating factor:

We believe the sixth aggravating circumstance to be that the defendant knowing[ly] mutilated the body of Chris Newsom at death. Again, we're relying upon Dr. Mileusnic's testimony in that she told you that Mr. Newsom was already dead when an accelerant was poured on him and he was set on fire. The fact that his body was burned that is our proof that his body was mutilated after death.

During the State's initial closing remarks, the prosecuting attorney did not mention this aggravating circumstance. In rebuttal to the Petitioner's closing argument, the State made the following remarks:

And then, finally, sort of one that often gets overlooked that I want to end on this morning. The [Petitioner] knowingly mutilated the body of Chris Newsom. Now, why is that an aggravator? Why does that even come in? He was already dead. Dr. Mileusnic told you that he didn't inhale any smoke. He was already dead. Nobody has ever suggested otherwise. But that's important because instead of -not only did [the Petitioner] and his

- 48 -

accomplices take Chris Newsom from his life and from his family, they took that body out, put it on that railroad tracks and burned it. Left him there for the whole world to see, exposed, nude from the waist down. This family would not get to have a funeral and see him lying peacefully there in that casket. They were deprived of even that! The last image they have of their son is lying there on those railroad tracks mutilated.

The State's opening and closing remarks totaled approximately twenty pages of transcript and were devoted primarily to advancing the other three aggravating circumstances and discrediting the mitigating proof. Furthermore, the evidence introduced in support of the invalid aggravator, as the prosecutor remarked in her opening statement during sentencing, was minimal and straightforward.

Upon consideration of the *Howell* factors, this court can affirmatively conclude beyond a reasonable doubt that the sentence of death the jury imposed for Mr. Newsom's murder would have been the same even without its consideration of the (i)(13) aggravating circumstance. Again, the three remaining aggravating circumstances focused on the manner of the murders, not on the Petitioner's actual participation. To that end, as our supreme court held on direct appeal of the Petitioner's convictions, "[A] reasonable jury could have easily concluded that *any one* or all four aggravating circumstances outweighed the mitigating circumstances presented by [the Petitioner]." 509 S.W.3d at 223 (emphasis added). Thus, the Petitioner was not prejudiced when the post-conviction court denied him the opportunity to present evidence about the Thomas testimony, and his free-standing Eighth Amendment ground for relief in this respect is without merit.

Next, we will address the grounds for post-conviction relief alleged in the petition and amendments thereto.

*Burden of Proof and Standard of Review*

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. *See* Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, a petitioner must show his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must establish the factual allegations contained in the petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the post-conviction court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. *State v. Nichols*, 90

S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)); *Cooper v. State*, 849 S.W.2d 744, 746 (Tenn. 1993). The Petitioner has the burden of establishing the evidence preponderates against the post-conviction court's findings. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

The Petitioner advances various grounds for relief, including ineffective assistance of counsel, prosecutorial misconduct, and other challenges to the imposition of the death sentence. A number of those grounds relate to issues that could have been, or actually were, raised on direct appeal. In order to avoid waiver, the Petitioner cursorily alleges in his appellate brief that counsel were ineffective for either failing to voice objections or to raise the issues on appeal. As the post-conviction court observed, the Petitioner did not offer any proof in support of most of the grounds alleging ineffective assistance of counsel. Nevertheless, we will address the merits of each alleged ground for relief that are not otherwise waived or previously determined. "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless" the ground is based on a newly created constitutional right not previously recognized or the failure to present the ground was the result of an unconstitutional state action. Tenn. Code Ann. § 40-30-106(g). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-106(h). "A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id.*

II. *Ineffective Assistance of Counsel*

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *Burns*, 6 S.W.3d at 461. As such, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, a trial court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. *Id.*

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for

his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady*, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court has adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. The performance prong of the *Strickland* test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. Additionally, the courts will defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting

*United States v. Cronic*, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If a petitioner shows that counsel's performance fell below a reasonable standard, then he or she must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, this court must determine "whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in a lesser sentence. *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *Id.* Similarly, a petitioner must show "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695).

Reviewing courts must indulge a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.*

As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim

of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987).

A. *Jury Selection*

The Petitioner challenges trial counsel's representation in a number of instances, but the focus of his argument relates to jury selection and, more specifically, the decision to seat a jury from Knox County. As the summary of the evidentiary hearing above demonstrates, the pretrial publicity in this case was unusually pervasive, extensive, and, at times, inflammatory. The Petitioner asserts that because of that publicity, the jurors who served during the trial were presumptively biased and were not impartial. The Petitioner thus argues that counsel were ineffective for failing to request an out-of-county jury. The Petitioner also argues that counsel did not competently conduct voir dire. We will address each claim in turn.

1. *Venue*

In Tennessee, a criminal defendant has the constitutional right to be tried in the county in which the crime occurred. Tenn. Const., art. I, § 9; s*ee also* Tenn. R. Crim. P. 18(a). The venue of the trial may only be changed upon motion of the defendant or by the court's own motion with the defendant's consent. Tenn. R. Crim. P. 18(a). Rule 18(a) provides that a "court should order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." *Id*.

Because the Petitioner is alleging that trial counsel were ineffective because they failed to request an out-of-county jury, the *Strickland* analysis applies. Thus, like the post-conviction court, we must first determine whether counsel's actions were objectionably reasonable and, if not, whether there was any resulting prejudice. "The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). "The mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue." *State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *see also Keith Whited v. State*, No. M2012-02294-CCA-R3-PC, 2014 WL 1832962, at *12 (Tenn. Crim. App. at Nashville, May 7, 2014) ("Prejudice will not be presumed by a mere showing that there was considerable pretrial publicity."). Instead, a "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans*, 383 S.W.2d 185, 192 (Tenn. 1992). As an aside, the Petitioner complains about trial counsel's decision regarding a change of venire, not a change of venue. As the post-conviction court

recognized, the distinction between a change of venire and a change of venue is slight for the purpose of reviewing the Petitioner's claim in this instance. *See* Tenn. Code Ann. § 20-4-201.

a. *Performance*

The post-conviction court held that "[t]he decision to not ask for a change of venue was not the result of inattention or lack of experience but of the considered judgment of counsel after a full discussion of the risk with their client. The [Petitioner] concurred with the decision." The court noted that "[t]he trial lawyers had thoroughly investigated the case, knew everything that was to be known, to include the massive and prejudicial negative publicity." The court further observed, "After a debate [counsel] still then decided [not to ask] for a change of venue/venire as they concluded that a jury could not be seated in Knox County and that somehow then the case would be aborted/dismissed." The court thus concluded that counsel's decision was objectively unreasonable. In reaching that decision, the post-conviction court offered the following reasoning:

> [U]nder the circumstances of this case, and even given the required deference and strong presumption in favor of trial counsel's decision, the Court finds that no competent counsel would have taken the action of trial counsel in this case. Put another way, no competent attorney reasonably could have decided not to move for a change of venue/venire.
>
> There are a multitude of reasons in support of the Court's opinion.
>
> (1) There was no end game to the idea that no jury could be chosen in Knox County. No authority by trial counsel was ever cited that the inability to be able to choose a jury in Knox County would somehow lead to a dismissal or light sentence by plea agreement. The Court is now aware of *Kirk v. State*, 41 Tenn. 344 (1860) although it was never cited by trial counsel. In *Kirk* the court did rule in 1860 that venue could not be changed over a defendant's objection even though the trial judge certified that no jury could be seated in Lawrence County because of prior knowledge of the case. The murder conviction in the adjoining county was reversed and the case remanded back to Lawrence County for further proceedings.
>
> Even if the first attempt to choose a jury had been unsuccessful, the case against [the Petitioner] would <u>not</u> have been dismissed. Many other options would have been available.

- 54 -

(a) a continuance until pretrial publicity threat abates. *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

(b) an exhaustive attempt to seat a jury. It is highly unlikely that in a county with over 200,000 people in the potential venire that a jury could not be seated. We know now that a jury was seated on the first attempt to choose a jury.

(c) It is unlikely if no jury could be chosen in Knox County, that present legal interpretation would not allow, even over Defendant's objection, the transfer of a case to another county or an out-of-county venire. *See e.g. Sailor v. State*, 733 So.2d 1057 (Fla. App. 1999) (State constitutional venue/jurisdictional rights may be overridden if absolutely necessary for a selection of a qualified jury even over defendant's objection); *Wafai v. People*, 750 P.2d 37, 47-48 (Colo. 1988) (same).

The trial counsel's strategy that no jury could be seated in Knox County and therefore this would result in a possible dismissal of the charges was not thought out, not fully researched, not plausible, and had almost no chance of benefitting [the Petitioner].

(2) The trial judge twice, on the record, suggested to trial counsel that a change of venue/venire was appropriate and he had already taken steps to procure a jury from Hamilton County.

(3) The prosecutor not only did not oppose a change of venue/venire, but stated he thought it was necessary.

(4) All the codefendants' lawyers asked for and were granted a change of venue/venire.

(5) Letalvis Cobbins was tried in August 2009, three (3) months before the [Petitioner's] trial with an out-of-county jury. Cobbins did <u>not</u> receive the death penalty even though it was sought. *See State v. Cobbins*, 2014 WL 4536564 (Tenn. Crim. App. Sept. 2014). What stronger indication could there be that an out-of-county jury might benefit [the Petitioner].

We agree with the post-conviction court's assessment that counsel's decision "was not the result of inattention or lack of experience." Moreover, the evidentiary hearing testimony shows that trial counsel thoroughly investigated the case and were fully aware of the extent of the pretrial publicity. The testimony further reveals that the two trial

attorneys had a difference of opinion about seating a jury from Knox County. Although Eldridge assumed they would request a change of venire, he reluctantly deferred to Trant's experience on the matter. To that end, Trant thought that if the jury selection process "dragged on," the State might be forced to negotiate further. While a delay tactic might appear objectively reasonable, negotiations already had occurred. Indeed, the defense team had been presented with a seemingly reasonable offer of life without the possibility of parole. Cobbins was the only codefendant tried before the Petitioner. Cobbins also was facing the death penalty, but his jury ultimately imposed a sentence of life without the possibility of parole. Both of the Petitioner's attorneys thought the case against the Petitioner was stronger than the cases against his codefendants. However, after extensive discussions, the Petitioner rejected the State's offer. As Trant testified, the Petitioner refused the offer for life without the possibility of parole because "he would just as soon have death . . . that the difference between the two was not a difference with distinction for him. And he was steadfast in that regard." The Petitioner ultimately regretted his decision. Regardless, it was objectively unreasonable for counsel to assume that the State would entertain further negotiations for a sentence less than life without the possibility of parole, especially given the strength of the case against the Petitioner, whom the State perceived as the ringleader of the crimes, and given that a jury had imposed a sentence of life without the possibility of parole for Cobbins. There also was some suggestion that the case might not ever go to trial. Obviously, as the post-conviction court stated, that scenario would never play out.

The State suggests on appeal that counsel's strategy was "virtually unchallengeable" and that their decision to seat a Knox County jury was reasonable. While being mindful that courts must indulge a strong presumption that the conduct of trial counsel fell within the wide range of reasonable professional assistance, we cannot agree with the State's position. Undoubtedly, trial counsel were highly experienced, and they engaged in a deliberate and thorough trial preparation in this case. Nevertheless, given that further negotiations or an outright failure to try the case were most certainly not a possibility, we agree with the post-conviction court's conclusion that counsel's performance was deficient in this regard.

### b. *Prejudice*

The Petitioner argues that the post-conviction court erred by finding that no prejudice resulted from counsel's deficient performance. The Petitioner contends that "because counsels' deficient performance resulted in a breakdown of the adversarial process, [he] need not show actual prejudice." In the alternative, he asserts that "the facts and circumstances of his case and those of his co-defendants establish such prejudice." In essence, the Petitioner argues that due to the extent and nature of the pretrial publicity, a fair trial could never occur in this case with a jury from Knox County.

Before concluding that the Petitioner was unable to demonstrate any resulting prejudice from counsel's actions, the post-conviction court conducted a detailed analysis of the jury bias issue. In support of its ruling, the post-conviction court cited Tennessee Rule of Criminal Procedure 24 and several state and federal opinions addressing the matter. The court found that no presumed or actual prejudice existed. For contextual purposes, we quote the substance of the post-conviction court's analysis as follows:

> In *Skilling v. United States*, 561 U.S. 358 (2010), the court addressed the issue. Skilling was an Enron executive and the trial took place in Houston, the home of Enron. The court first reviewed prior cases where the court had set aside verdicts because of corrupting pretrial publicity; a carnival atmosphere that dominated the trial; and what the [C]ourt termed a "kangaroo court proceeding." The court then stated:
>
> > In each of these cases, we overturned a "conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage"; our decisions, however, "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 798-799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975). *See also, e.g.*, *Patton v. Yount*, 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155-156, 25 L. Ed. 244 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."). A presumption of prejudice, our decisions indicate, attends only the extreme case.
>
> *Skilling*, 561 U.S. at 380-81 (footnotes omitted). [Post-conviction court footnote omitted].

Among the cases distinguished by the *Skilling* Court was *Irvin v. Dowd*, 366 U.S. 717 (1961) in which the Court found presumed prejudice and reversed the murder conviction for the murder and robbery spree in a small rural community. In the months before the *Irvin* trial "a barrage of publicity was unleashed against him including reports of his confession to the slaying and robberies." The publicized detailed facts in *Irvin* are not quite as extreme as this case but [the] *Irvin* facts are more extreme than *Skilling*. *Skilling*, 561 U.S. at 392-93.

The Court found no presumed prejudice in the *Skilling* case and indicated it considered a number of factors.

> (1) size and characteristics of the community;
> (2) was there blatantly prejudicial publicity;
> (3) what was the time period of news coverage in relation to the trial;
> (4) did the jury acquit on any of the charges;
> (5) how aggressive was the trial judge in guarding against prejudice and in taking appropriate steps to reduce the risk.

*Skilling*, 561 U.S. at 382-85. [Trial court footnote omitted].

This court considered the above factors as follows:

1. Knoxville had a 2009 population in excess of 430,000 and a population eligible for jury service well in excess of 200,000. It is a university town and its education level is consistent with its urban environment and economic prosperity.

2. The news stories about [the Petitioner] and his confederates were extensive, vivid, sometimes inaccurate, overzealous and contained statements by the victims' families and others calling for the death penalty for these heinous crimes. The Court credits the Petitioner's witnesses on the extent of publicity shown at the January 28-29, 2019 hearing.

3. The volume of publicity continued from the date of arrest with some variation, shown by the proof, which included the prior trials of Boyd and Cobbins, right up to the trial of [the Petitioner] in October 2009.

4. The jury found the Petitioner guilty of all counts charged except for the lesser of facilitation in the sexual assault of Chris Newsom. This

- 58 -

factor, however, is no indication of unfairness when the proof of guilt is strong on all the charged counts. *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 68-71 (D.C. Mass. 2016).[3] There is no showing here that the jury was in a rush to judgment during its deliberations.

5. The trial judge and counsel employed a screening questionnaire and follow up voir dire which lasted nine days. Individual voir dire lasted eight days. The judge and counsel sat at a table and questioned each juror in an informal manner lending itself to encouraging frankness. Group voir dire took place on the ninth day. Petitioner's counsel had the assistance of a jury consultant. [Footnote: "Voir dire in *Skilling* lasted 5 hours."]

6. The individual voir dire specifically dealt with exposure to pretrial publicity as well as views of the death penalty.

7. Jury selection (and the trial) was conducted with solemnity. No circus or carnival atmosphere invaded the jury selection process or the trial.

The post-conviction court found no presumption of prejudice. Even so, it further found that any presumption had been sufficiently rebutted. The court noted that Rule 24(c) "is consistent with multiple court decisions which hold that prior knowledge or even an impression and opinion as to the merits of a case are not automatically disqualifying if the juror can set that aside and be fair and impartial. *Skilling*, 561 U.S. at 381."

Rule 24 governs the jury selection process in Tennessee. The relevant section of that Rule outlining challenges for cause due to "exposure to information" provides:

The prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, *the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality*. A prospective juror who admits to having formed an opinion about the case is subject to

---

[3] Tsarnaev appealed his case to the United States Court of Appeals for the First Circuit, and the United States Supreme Court has granted certiorari in the case. *See United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), *cert. granted*, 141 S. Ct. 1683 (2021).

challenge for cause *unless the examination shows unequivocally that the prospective juror can be impartial.*

Tenn. R. Crim. P. 24(c)(2)(B) (emphasis added). The post-conviction court reiterated that because the Petitioner was challenging counsel's effectiveness, he was required to demonstrate actual jury bias in order to satisfy the prejudice prong of *Strickland. See Anne Marie Kent v. State*, No. M2017-01532-CCA-R3-PC, 2018 WL 2189706, at *13 (Tenn. Crim. App. at Nashville, May 14, 2018) (citing *Evans*, 383 S.W.2d at 192)). The court then held that the Petitioner failed to meet his burden:

> Trial counsel, having decided to try the case in Knox County because they thought a fair jury could not be seated, had strong incentive during the nine days of jury selection (eight days of individual voir dire) to be meticulous in ferreting out unqualified jurors. They even employed a jury consultant to assist them. It is important to note that trial counsel were sufficiently satisfied that they did not use all their peremptory challenges. Even more to the point, none of the seated jurors were challenged for cause.

> The trial judge was committed to the selection process as he had previously expressed his concern regarding the pretrial publicity. His admonishment and instructions to the jury were direct and clear and, when required, directed individually to seated jurors. He was directly involved in all aspects of the jury selection process.

> The individual voir dire of the potential jurors is always a factor to be considered related to the quality of the voir dire procedure. *Skilling*, 561 U.S. at 389.

> Petitioner contends that the length of the voir dire indicates the extent to which the jury was infected by prejudicial publicity. The undersigned has presided over eight (8) death penalty trials and the voir dire in those trials all involved individual voir dire and took from three to six days. Jury selection in a death penalty case not only involves exposure to publicity but it involves an exploration of views on the death penalty which is a separate area of complexity. Furthermore, the judge is always faced with prospective jurors with health problems, child or work commitments, or other issues related to service on a lengthy trial. It is not an easy task to seat a jury in a death penalty case. The Court is of the opinion that the length of the voir dire is a positive rather than a negative as relates to the jurors finally seated in the case. It is an indication of how careful counsel and the court were in insuring that the jurors chosen would be fair and impartial.

An initial screening of the jurors was done by distribution in September 2009 of a questionnaire. The questionnaire was 24 pages long and contained 128 questions. It concluded with a 6-paragraph admonition which the juror, under penalty of perjury, had to acknowledge and to state that he/she "will conduct myself accordingly." The use of a questionnaire is a factor to consider in judging the jury selection process. *Skilling*, 561 U.S. at 388-389.

The Court puts reliance on the comments of the Supreme Court in *Mu'Min v. Virginia*, 500 U.S. 415 (1991). Mu'Min was an inmate serving time for murder who escaped and committed another murder and for that murder he received the death penalty. The pretrial publicity was intense prior to his trial. Many of the jurors had read about the case and the issue before the court was whether or not a jury was fairly selected given the alleged meager voir dire on pretrial publicity and prejudice. Ultimately, the Court found no violation of constitutional requirements. The following observation regarding *Irvin v. Dowd* is instructive.

> A trial court's findings of juror impartiality may "be overturned only for 'manifest error.'" *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889, 81 L. Ed. 2d 847 (1984) (quoting *Irvin v. Dowd*, *supra*, 366 U.S. [717, 723], 81 S. Ct. [1639, 1643 (1961)]. In *Patton*, we acknowledged that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed," 467 U.S., at 1031, 104 S. Ct., at 2889, but this is not such a case. Had the trial court in this case been confronted with the "wave of public passion" engendered by pretrial publicity that occurred in connection with Irvin's trial, the Due Process Clause of the Fourteenth Amendment might well have required more extensive examination of potential jurors than it undertook here.

*Mu'Min*, 500 U.S. at 428-29. Here the trial judge did just what the Supreme Court suggested, in the face of possible public passion he undertook an extensive voir dire to include the lengthy individual voir dire of the jurors on the issue of pretrial publicity.

This Court has carefully read the questionnaires and testimony of the 12 jurors who decided this case as well as the group voir dire. All the jurors

had heard of the case, but nine indicated they had no opinion about [the Petitioner] even being involved. Two jurors had heard of his "involvement" but were "unsure" if he was guilty or not. Only one stated that [the Petitioner] was "probably guilty" but assured the judge he could set that view aside. The juror who stated [the Petitioner] was "probably guilty" was the one African-American on the jury. Some of the jurors had heard of the prior Cobbins verdict but only one had watched more than a snatch of the trial and that was the juror mentioned above who thought [the Petitioner] was "probably guilty." There was no proof that the Cobbins verdict bled into views about [the Petitioner] for the other 11.

The Court's consideration of the entire voir dire process is counted as set out below:

> 200 called into court
> 130 dismissed for various reasons
> 70 jurors left for general voir dire
>
> 80 dismissed for cause
> 10 challenges for cause denied
> 50 hardship or other disqualifications

| **Reasons for Dismissal for Cause (80 total)** | |
| --- | --- |
| Publicity | 33 |
| Automatically Vote for Death | 9 |
| Never Vote for Death | 15 |
| Relationship with persons involved in case | 16 |
| Victim of Similar Offense | 2 |
| Other | 3 |
| Multiple Reasons | 1 |
| Unknown (not discussed on record) | 1 |

| Multiple reasons | |
| --- | --- |
| Publicity, cannot vote for death | 1 |

| Other: | |
| --- | --- |
| Ex-prosecutor | 1 |
| Joined Facebook Group (after telling Court she had not) | 1 |
| Poor views of law enforcement | 1 |

The dismissals for exposure to pretrial publicity are not inordinately high. Contrast this with the four (4) week voir dire involving 430 persons, 268 of whom were excused for cause as having fixed opinions in *Irvin v. Dowd*. Of the 12 jurors seated in *Irvin*, eight thought he was probably guilty. *Irvin v. Dowd*, 366 U.S. at 720, 727.

The Court notes that the Petitioner did not call any of the 12 trial jurors (or explain their absence) at the January 28-29, 2019 hearing. If, as feared, the jury deliberated or discussed matters not admitting into evidence, Petitioner's Counsel had every right to produce that testimony. A juror's undisclosed bias can be proven post-trial. *See Remmer v. United States*, 347 U.S. 227 (1954). Furthermore, jurors may testify post-trial "on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, [or] whether any outside influence was improperly brought to the jury's attention." TRE 606(b).

The Court is well aware of the rationale supporting the outcome in cases like *Irvin v. Dowd* and *United States v. Casellas-Toro*[, 807 F.3d 380 (1st Cir. 2015)] because there is a real concern that if an atmosphere of inflammatory prejudice saturates a community then individual jurors are unable to rise above the community contagion. Even though the trial jurors in good faith express fairness in the jury selection process they simply cannot shed the community predisposition.

The Court has considered the level of community predisposition generated by the described media coverage in this case, but holds that the jury selection process which resulted in the selection of the 12 jurors that decided this case has, for the reasons stated above, rebutted any prejudice (if it was presumed) generated by the pretrial publicity. The jury in this case was fairly seated and each juror met the requirements of Tenn. R. Crim. P. 24 and constitutional requirements of impartiality. *Skilling*, 561 U.S. at 380-81 and *Murphy v. Florida*, 421 U.S. 794 (1975). [Post-conviction court footnote omitted]. The fear that a jury could not be selected in Knox County did not even come close to being realized nor was the fear of utter corruption of the trial atmosphere realized. It has oft been stated that "the ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *Kent v. State*, 2018 WL 2189706 *13 (Tenn. Crim. App. May 2018) (citing *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)). The Court holds that the claim that [the Petitioner] suffered presumed prejudice as a result of the asserted prejudicial effects of the pretrial publicity, if it existed, has been rebutted.

Initially, and contrary to the Petitioner's argument on appeal, this court finds that this is not a case "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (Tenn. 1984). In *Cronic*, the United States Supreme Court held that in certain limited instances, the prejudicial effect of an attorney's deficient performance may be presumed. Those circumstances include: (1) "the complete denial of counsel"; (2) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-60. None of those circumstances are present in this case. As the State asserts, "Trial counsel tested the [P]etitioner's prospective jurors extensively for bias through questionnaires, the initial eight-day round of individual voir dire, and the second round of voir dire in which peremptory challenges were issued." Moreover, counsel retained the services of a jury selection expert. The record reflects that trial counsel clearly engaged in a hard-fought defense for the Petitioner. Thus, the Petitioner's reliance on *Cronic* is misplaced, and the *Strickland* standard controls.

The Petitioner's insistence that prejudice should be presumed because of the extent and nature of the pretrial publicity also is without merit. It is well-settled law that jurors are not required to be ignorant of the facts of a case or otherwise be free from "some impression or opinion as to the merits of the case." *Skilling*, 561 U.S. at 381 (citing *Irvin*, 366 U.S. at 722); s*ee also* Tenn. R. Crim. P. 24(c)(2)(B); *Mann*, 959 S.W.2d at 532. The Supreme Court emphasized that prejudice should only be presumed in "extreme case[s]." *Skilling*, 561 U.S. at 381. It is undisputed that this case garnered extensive media coverage. However, that fact alone does not warrant relief to the Petitioner. In 1961, well before the advent of the modern communication revolution, our supreme court opined:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.

The post-conviction court aptly recognized that this case did not present the same type of "carnival atmosphere," either before or during the trial, as those described by the Supreme Court as "extreme cases." As the Supreme Court in *Skilling* reminds us, "[P]retrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial." 561 U.S. at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)). The Petitioner does not contend that the jury was unduly influenced by extraneous information after it was impaneled. Given this court's independent review of the record, we will not presume prejudice herein. Again, the Petitioner is challenging his attorneys' representation in the post-conviction context. This is not a direct review of his convictions and sentences, as was the case in *Skilling*. The *Strickland* standard of review applies to our determination of the issue at hand. Thus, the Petitioner must demonstrate that actual prejudice resulted from counsel's decision. *See Anne Marie Kent*, No. M2017-01532-CCA-R3-PC, 2018 WL 2189706, at *13.

*Skilling* recognized that certain precautionary measures will guard against the risk of actual juror prejudice. Those measures include juror questionnaires, individual voir dire, peremptory challenges, and jury instructions. *Skilling*, 561 U.S. at 386-88 and n.21. As recounted above, every single one of those measures was utilized in this case. Despite trial counsel's concerns about the pretrial publicity, they testified during the evidentiary hearing that their fears of being unable to seat a jury in Knox County were unrealized. The meticulous jury selection process that occurred in this case is described above. Counsel used the services of a jury selection expert before and during the selection process. Lengthy questionnaires were utilized and potential jurors were rated based on their responses. Counsel investigated jurors' social media accounts. The trial judge gave counsel "a great deal of leeway" during the process and did not rush the nine-day voir dire. Counsel testified that they had no basis to strike for cause any of the twelve jurors who actually ended up on the panel. Although all of the jurors knew about the case, every single one stated that he or she could set aside any preconceived notions and decide the case on the facts presented at trial. Tellingly, counsel did not use all of their peremptory challenges.

In *Skilling*, trial counsel unsuccessfully challenged one juror for cause and exhausted all of their peremptory challenges. In rejecting Skilling's claim of bias due to pretrial publicity, the Supreme Court afforded great deference to the trial court's assessment that each juror was fit to serve: "'A trial court's findings of juror impartiality may be overturned only for manifest error.'" 561 U.S. at 396 (quoting *Mu'Min*, 500 U.S. at 428)). The Supreme Court cautioned that "[a]ppellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges." *Id.* at 386. "This face-to-face opportunity to gauge demeanor and credibility, coupled with information from

the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service." *Id.* at 395.

Here, the record shows that the attorneys and the trial judge undertook the same painstaking care in this case. Moreover, the trial judge issued instructions to the jury throughout the selection process and throughout the trial itself regarding each juror's sworn duty to decide the case based only on the evidence presented in court. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) ("It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court."). Again, neither trial attorney observed any impaired behavior on behalf of the trial judge. Furthermore, the Petitioner offered no clear and convincing evidence in support of his speculative arguments that a juror may have attempted "to lie their way onto" the panel or that any of the jurors actually harbored racial biases that affected their ability to remain fair and impartial. The Petitioner's unsupported claim that potential jurors might have ignored the trial court's instructions during the selection process is unfounded as well. *Id.* Again, trial counsel found no reason to challenge for cause any of the jurors who ended up sitting on the case. Although the pretrial publicity was pervasive in this case, trial counsel were able to mitigate any adverse effects through the lengthy and thorough jury selection process. Finally, as the State argues, the Petitioner's reliance upon the sentences received by his codefendants in support of his position that *his* jury was biased is misplaced. Each case must be examined on its own record. This court's review of the record in the case at hand simply belies the Petitioner's argument that his jury was not impartial. The post-conviction court found that the Petitioner failed to demonstrate prejudice because he did not meet his burden to show actual jury bias. We agree that the Petitioner has failed to carry his burden of establishing that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. To the extent the Petitioner raises a freestanding claim of an impartial jury, the same is waived for not having been raised on direct appeal. Tenn. Code Ann. § 40-30-106(g).

### 2. *Voir dire*

The Petitioner raises several other challenges to trial counsel's handling of voir dire. The Petitioner only minimally explored one of those claims, i.e., the use of peremptory challenges, during the evidentiary hearing. We will nevertheless address each claim the Petitioner raises in his appellate brief. Initially, this court previously has observed that "a trial lawyer is 'accorded particular deference when conducting *voir dire*' and his or her 'actions during *voir dire* are considered to be matters of trial strategy.'" *William Glenn Rogers*, No, M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *36 (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). To that end, "'[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'" *Id*. This

court also has emphasized that "the obvious corollary to the prerequisite that a post-conviction petitioner alleging ineffective assistance of counsel during jury selection must prove that the eventual jury was biased, is that the trial lawyer's performance with respect to jurors who were not ultimately seated on the jury is irrelevant." *Id.* at \*40.

### a. *Questionnaires*

The Petitioner raises a scant argument in his brief that "[d]ismissing jurors based on their questionnaires, as occurred here, constitutes ineffective assistance of counsel and reversible error and warrants relief as a standalone claim." However, he neglects to identify any specific instances of alleged misconduct. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, as the post-conviction court found, the Petitioner did not question trial counsel during the evidentiary hearing about their actions in that respect. Again, this court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. The Petitioner has failed to carry his burden of proof. Tenn. Code Ann. § 40-30-110(f). Thus, he is not entitled to relief on this claim. Furthermore, the Petitioner's argument that the trial court court violated his rights when it dismissed jurors based solely on the responses to the questionnaires is waived. Tenn. Code Ann. § 40-30-106(g).

### b. *Life Qualifying*

The Petitioner argues that "trial counsel failed to adequately ensure that the prospective jurors could consider his mitigating evidence in light of [the] case's aggravating circumstances, as well as otherwise adequately 'life-qualify' the jury." He also contends that counsel "failed to rehabilitate scrupled jurors regarding their views of the death penalty." Aside from citing some seemingly relevant authority, the Petitioner again neglects to identify any specific instances of the alleged misconduct. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, as with the preceding claim, the Petitioner did not question trial counsel during the evidentiary hearing about their actions in this respect. Therefore, this court agrees with the post-conviction court's conclusion that the Petitioner is not entitled to relief on this claim.

### c. *Failure to Object*

The Petitioner contends that trial counsel erroneously failed to object to the State's questioning during voir dire. The post-conviction court ruled on this issue as follows:

During the post-conviction hearing trial counsel were asked no questions about the State's voir dire questions, so this Court has no way of knowing whether trial counsel's failure to object resulted from a strategic decision. Furthermore, this Court has reviewed the voir dire transcript and finds that on the whole, the State's questions during jury selection were proper and did not prejudice Petitioner.

We agree. The Petitioner suggests in his brief that the State solicited "pledges" from the jurors as to how they would decide the case. The transcript of the voir dire belies that suggestion. Instead, the jurors were properly questioned about their ability to follow the law. Moreover, trial counsel were not questioned about why they did not voice objections as the Petitioner now claims they should have. Therefore, the Petitioner is not entitled to relief on this issue. Similarly, his standalone claim that the State's inappropriate conduct during voir dire warrants a new trial is waived. Tenn. Code Ann. § 40-30-106(g).

### d. *Peremptory Challenges*

Trial counsel acknowledged during the evidentiary hearing that they did not utilize all of their peremptory challenges during jury selection. Eldridge testified that they did not do so because their expert advised them that there were less favorable jurors remaining in the pool. Trant testified that if he had thought a juror should have otherwise been excused for cause, counsel would have used a peremptory challenge. He further testified that there was nothing he would have done differently during jury selection. On appeal, the Petitioner argues that because counsel utilized only twelve of the fifteen available peremptory challenges, "at least seven jurors" had watched a portion of Cobbins' trial or "felt [the Petitioner] was probably guilty before [his] trial began." The Petitioner's argument ignores the fact that each of those jurors affirmatively stated, to the satisfaction of trial counsel and the trial judge, that they could decide the case solely on the evidence presented at trial. Again, trial counsel were not questioned about their decision with respect to these specific jurors. Counsel employed a jury selection expert and relied on her advice before and during voir dire. Counsel cannot be deemed ineffective for following that advice. *See, e.g., Dennis Wade Suttles v. State*, No. E2008-02146-CCA-R3-PD, 2011 WL 1642640, at *26 (Tenn. Crim. App. at Knoxville, Apr. 29, 2011). This is simply the type of trial strategy, without any explanation from counsel, that this court is not at liberty to second-guess. *See, e.g., Steven Ray Thacker v. State*, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227, at *50 (Tenn. Crim. App. at Jackson, Mar. 23, 2012). The Petitioner is not entitled to relief on this ground.

### e. *Challenges for Cause*

The Petitioner argues that the post-conviction court erred by failing to excuse two jurors for cause because they allegedly equivocated about being able to set aside any preconceived notions concerning the Petitioner's guilt. He also complains that trial counsel were ineffective for not moving to excuse those two jurors for cause and for not raising the issue on appeal. The issue as it encompasses a challenge against the trial court's actions is waived. Tenn. Code Ann. § 40-30-106(g). Regardless, the transcript of jury voir dire does not support the Petitioner's assertion. Moreover, as the post-conviction court recognized, the Petitioner did not question counsel as to why they did not challenge either of those two jurors for cause or otherwise raise the issue on appeal. Again, this court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. The Petitioner has simply failed to carry his burden of proof herein. This court must, therefore, presume counsel's actions were tactical in nature. The Petitioner is not entitled to relief on this claim.

B. *Judge Baumgartner*

The Petitioner argues that trial counsel failed to present adequate evidence during the motion for new trial hearing about the original trial judge's documented addiction. As noted earlier in this opinion, though, this issue has already been addressed by the courts. *See Letalvis Cobbins et al.*, No. E2012-00448-SC-R10-DD (order); *Davidson*, 509 S.W.3d at 227-29. The Petitioner now suggests that trial counsel did not present *enough* evidence to support the claim. During the proceeding below, the post-conviction court afforded the Petitioner the opportunity to present

> proof of any misconduct by the trial judge, not previously shown, that should have been offered by trial counsel in their motion for new trial. This would include misstatements by the judge, failure to respond, prejudicial statements, lapses of memory, slurred speech, confusion, sleeping on the bench, and failure to properly control the courtroom.

Again, however, neither trial attorney testified during the hearing that they noticed any such misconduct. Indeed, both of them testified that they did not notice any impairments by the trial judge. Therefore, despite the fact that this issue has been previously determined, the Petitioner has failed to support this ground of ineffective assistance of counsel with clear and convincing evidence. Tenn. Code Ann. § 40-30-106(h). This argument is without merit.

C. *Jury Questions*

The Petitioner contends that "[t]he trial court mishandled the use of juror questions throughout [his] trial." The Petitioner raised this issue on direct appeal of his convictions. This court held that with the adoption of Rule of Criminal Procedure 24.1, "the practice of permitting jurors to pose questions to witnesses is no longer disfavored in this state." *Davidson*, 509 S.W.3d at 236 (affirming this court's ruling on the issue). Thus, to the extent the Petitioner challenges the trial court's actions in this respect, the issue has been previously determined. Tenn. Code Ann. § 40-30-106(h). He also argues, in total, that "trial counsel was ineffective for not objecting to the trial court's conduct, for making the wrong objections, or for not properly raising the issue on appeal, as well as not preserving the juror questions themselves." This court ruled on direct appeal:

> Here, the trial court denied the defendant's pretrial motion to prohibit the jurors from submitting questions and then followed the procedure set forth in Rule 24.1 for the handling of juror questions during the trial. The defendant cites no authority for the proposition that Rule 24.1 is inapplicable to capital trials, and we find none. Under these circumstances, we cannot say that the trial court abused its discretion by permitting jurors to submit questions.

*Davidson*, 509 S.W.3d at 236. Thus, despite counsel's pretrial objection, this court found no error in the process employed by the trial court. And despite not questioning counsel about this during the evidentiary hearing, the Petitioner's challenge to counsel's conduct in this respect is simply without merit.

### D. *Statement to Police*

The Petitioner argues that trial counsel failed to litigate adequately the suppression of his statement to the police or "to guard against the prejudicial impact of the video of the statement once played at trial." He acknowledges that this issue was raised on direct appeal. Indeed, our supreme court conducted an in-depth analysis of the issue and found that the trial court did not err by denying the Petitioner's pretrial motion to suppress his statement. *Davidson*, 509 S.W.3d at 186-92. Moreover, the Petitioner has failed to demonstrate what counsel should have done differently. Thus, he is not entitled to relief on this ground.

### E. *Ballistics Expert*

The Petitioner challenges trial counsel's decision not to retain an independent ballistics expert, stating, "Had [the Petitioner's] counsel retained an independent ballistics expert, they would have been able to cast further doubt on the State's theory that the weapon found with [the Petitioner] at the time of his arrest was the weapon used in the

killing of Christopher Newsom." As noted above, the Petitioner unsuccessfully requested post-conviction funding for the services of a ballistics expert. He does not advance a direct challenge to that ruling on appeal. In denying relief on this ground of ineffective assistance of counsel, the post-conviction court offered the following reasons, which are found in its ruling on the request for funding as well in its final order:

> In this Court's view, the Petitioner's pleadings and the arguments put forth at the ex parte hearing do not suggest a likelihood that an independent expert could reach conclusions other than those reached by Ms. Resig [the State's trial expert] and advanced by the State at trial – namely, that certain class characteristics of [the Petitioner's] gun were consistent with two of the bullets retrieved from Mr. Newsom, consistencies also shared by thousands of other firearms. The evidence and expert opinions put forth at trial suggest that [the Petitioner's] gun could have been used to kill Mr. Newsom, but such a conclusion is far from certain. While [the Petitioner's] pistol was not eliminated as the murder weapon, it was not established as the murder weapon, either.

> . . . .

> The Petitioner took issue with the Court's failure to fund a firearm expert. This seems to relate to the trial testimony that the Petitioner's handgun was a .22 caliber and that Chris Newsom was shot with a .22 bullet which could have come from the Petitioner's pistol but it also could have come from many thousands of other .22 pistols. The Supreme Court found this evidence relevant but "not highly probative." *State v. Davidson*, 509 S.W.3d at 207. Furthermore, [the Petitioner] in his statement to the police stated that he "assumed" his pistol was used to kill Chris Newsom. He stated that he thought Thomas had taken his pistol off his dresser, used it to kill Chris Newsom, and then returned it. An additional firearm expert was not warranted.

The Petitioner has not satisfied either prong of the *Strickland* standard on this ground. As the post-conviction court observed, counsel were not questioned about why they chose not to challenge the State's inconclusive and "not highly probative" evidence on the subject. Regardless, the Petitioner's assertion that an independent ballistics expert may have "cast further doubt" on the State's theory is not the same as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The State's expert testified that any one of thousands of guns could have been the weapon used to kill Mr. Newsom and, as our supreme court announced on direct appeal, "It was up to the jury to decide how much

- 71 -

weight to give this testimony." *Davidson*, 509 S.W.3d at 207. The Petitioner is not entitled to relief on this issue.

F. *Diminished Capacity*

The Petitioner complains that trial counsel did not adequately investigate or present a guilt phase defense of diminished capacity. This court has already discussed the Petitioner's claim that he was denied sufficient funding and time during the post-conviction proceeding to investigate trial counsel's presentation of mitigating evidence during sentencing. The Petitioner has failed to carry his burden with respect to the instant ground for relief. He did not question either trial attorney about a diminished capacity defense. However, both attorneys testified about the Petitioner's general intelligence and lack of any evidence of a mental health impairment. Moreover, the pretrial evaluations the Petitioner underwent revealed no actionable abnormalities. This court finds that trial counsel were not deficient in this respect.

G. *Defense Witnesses*

The Petitioner contends that trial counsel were ineffective for calling two witnesses, Ethel Freeman and Jeffrey Bradley, to testify at trial. Freeman testified that she sold some bedding and used furniture to the Petitioner and that he was supposed to bring a payment for the items to her Washington Ridge apartment on the night of January 6, 2007, but never arrived. *Davidson*, 509 S.W.3d at 174-75. According to the trial transcript, Bradley testified that one or two nights before the police found Ms. Christian's 4Runner, he was looking for his mother's cat and saw a Pontiac Trans Am arrive at the Chipman Street residence.[4] Bradley said that he saw the Petitioner and Ms. Christian get out of the Pontiac and that he assumed they went into the house. The Petitioner argues that trial counsel were deficient in calling Freeman and Bradley as defense witnesses because their "testimony was ultimately harmful" to his defense. However, the Petitioner neglected to question either trial attorney during the evidentiary hearing about their decision to call the two witnesses at trial. As the State maintains, this "is a classic example of a claim that needs testimony from trial counsel at the post-conviction hearing." Without any explanation, this court will not second-guess trial counsel's strategy with regard to the two witnesses. *Strickland*, 466 U.S. at 689. Again, "the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper*, 847 S.W.2d at 528. Despite failing to show how counsel's actions were deficient, the Petitioner also has not demonstrated any resulting prejudice. As the post-conviction court held,

---

[4] Bradley's testimony is not mentioned in the direct appeal opinions of this court or our supreme court. *See Davidson*, 509 S.W.3d at 171-79; *State v. Lemaricus Devall Davidson*, No. E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *2-4 (Tenn. Crim. App. at Knoxville, Mar. 10, 2015).

First, the testimony of these two witnesses was not the deciding factor in the jury's convicting [the] Petitioner and sentencing him to death. Secondly, even if these two witnesses had not testified at [the Petitioner's] trial, the jury was presented with more than enough evidence to find [the Petitioner] guilty of the offenses for which he was convicted beyond a reasonable doubt. Counsel's presentation of these witnesses did not prejudice Petitioner; therefore, counsel did not render ineffective assistance as to this issue.

The Petitioner is not entitled to relief on this ground.

### H. *Implicit Bias Evidence*

The Petitioner claims that "trial counsel failed to object to questions and testimony that played to the potential implicit biases of the jury." The Petitioner alludes to certain testimony and statements that referenced gang affiliation, pejorative nicknames, promiscuous relationships with white women, and negative references to the Petitioner's neighborhood, drugs, and race. Again, however, the Petitioner did not question trial counsel during the evidentiary hearing about any of that evidence. Therefore, the Petitioner has not satisfied his burden of proof herein.

### I. *Presentation of Mitigation during Guilt Phase*

The Petitioner asserts that the conduct of trial counsel was deficient because they failed "to harmonize their theory of defense with the case for mitigation." The Petitioner alludes to the defense theory that the victims intended to buy drugs from the Petitioner. Without offering any evidence in support thereof, the Petitioner merely argues that "[c]ounsel's theory of defense likely inflamed the jury against [the Petitioner] by impugning the decedents' character, while offering no valid defense to rape or murder and damaging the case for life."

The defense's theory of the case was to attempt to blame the Petitioner's codefendants and to establish an alternative theory about why the victims were at the Petitioner's house. Counsel said they were zealously trying to defend the Petitioner without regard to the public's reaction about their theories. However, as the post-conviction court observed, "[C]ounsel were not asked any questions about 'front-loading' mitigation during the guilt/innocence phase, so this Court has no evidence before it to determine whether trial counsel considered such a strategy."

Again, "the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper*, 847 S.W.2d at 528.

The Petitioner is asking this court to second-guess trial counsel's strategy. However, as discussed above, reviewing courts must indulge a strong presumption that the conduct of trial counsel fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*, 629 S.W.2d at 9 (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* The record reflects that trial counsel engaged in a deliberate and informed presentation of a defense for the Petitioner during both phases of the trial. We note that the Petitioner did not testify at the post-conviction evidentiary hearing. He has failed to carry his burden of establishing any constitutionally deficient performance in this respect.

### J.  *Opening/Closing Arguments*

The Petitioner argues that trial counsel were ineffective for failing to voice objections to the prosecutor's remarks at various times during closing arguments in the guilt phase and during opening and closing arguments in the sentencing phase. Although the Petitioner highlights some of the alleged instances of improper argument, he neglected to question either trial attorney about the reasons for their inaction.

As this court has recognized, "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. at Jackson, Jan. 15, 2010). Trial counsel could have decided not to object for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. *Id.* (citing *Gregory Paul Lance v. State,* No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. at Nashville, Aug. 16, 2006)). Thus, testimony from trial counsel about why they did not object to the allegedly prejudicial remarks was essential for a determination of whether trial counsel was ineffective. This court has held that "[w]ithout testimony from trial counsel or some evidence indicating that his [or her] decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton,* No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. at Nashville, Jan. 12, 2007).

The Petitioner did not present any evidence at the evidentiary hearing to suggest that trial counsel's failure to object to the prosecutor's remarks were anything other than tactical decisions. The Petitioner failed to carry his burden, and he is not entitled to relief on this ground. To the extent the Petitioner directly challenges the prosecutor's remarks, the issue is waived. Tenn. Code Ann. § 40-30-106(g).

K. *Reasonable Doubt Instruction*

The Petitioner challenges the reasonable doubt instruction given to the jury by the trial court in this case. Any direct challenge to the court's instruction is waived, however. *Id*. Moreover, as the post-conviction court correctly ruled, the language of the instruction given in this case was the same that had recently been approved by our supreme court. *See State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008). Thus, trial and appellate counsel cannot be deemed ineffective for failing to challenge it.

L. *Victim Impact Evidence*

The Petitioner contends that although trial counsel "generally" challenged the victim impact statements introduced during the sentencing phase, they did not sufficiently do so. The record reflects that counsel adopted an extensive pretrial motion to exclude such evidence. However, the trial court denied the motion. Moreover, although the Petitioner now suggests that counsel should have voiced objections to the introduction of that evidence during the trial, the Petitioner did not question trial counsel about the victim impact evidence. To the extent the Petitioner directly challenges the introduction of that evidence, that issue was addressed on direct appeal. *See Davidson*, 509 S.W.3d at 245.

M. *Mitigation Report*

The Petitioner argues that trial counsel were ineffective for failing to object adequately to the State's request for the report prepared by his mitigation specialist. After the direct testimony of the specialist, Rosalind Andrews, the State requested her report. *See* Tenn. R. Crim. P. 26.2. Trial counsel objected on the basis that Ms. Andrews was not testifying as an expert. *See* Tenn. R. Evid. 705. The trial court overruled defense counsel's objection. The record reflects that the State offered trial counsel the opportunity to identify any inadmissible portions of Ms. Andrews' report, but the record does not clearly reflect the outcome of that offer. *See* Tenn. R. Crim. P. 26.2(b)(2). The Petitioner now argues that counsel should have done more to ensure the State did not receive a copy of the report and should have objected to unidentified questions by the State during cross-examination of Ms. Andrews. Again, however, the Petitioner did not question trial counsel during the evidentiary hearing about their actions in that regard. Thus, this court will presume that

counsel's decision not to pursue the matter further was tactical. *Strickland*, 466 U.S. at 689.

N. *Appellate Issues*

In addition to challenges the Petitioner advances toward the actions of counsel during the trial, he also claims that counsel were ineffective for failing to raise certain issues on direct appeal of his convictions. Some of those claims have been discussed elsewhere in this opinion. Under this specific heading in his brief, the Petitioner claims that counsel were ineffective for failing to include the transcript of the voir dire or the juror questionnaires in the record on direct appeal. In support thereof, he summarily argues in his brief as follows:

> Despite raising numerous objections during the nine days of jury selection, trial counsel failed to transcribe the proceedings, enter it into the record, or cite to it in their briefs. Relatedly, trial counsel failed to ensure that the jury questionnaires, on which many of these objections rested in part, were preserved and made part of the appellate record, thereby robbing appellate courts of information about the venire. Based on numerous objections made during jury selection, appellate counsel could have raised claims alleging trial court error and bias that prejudiced [the Petitioner].

The same *Strickland* test is used to determine the effectiveness of appellate counsel. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). Thus, "a petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful." *Michael Fields v. State*, No. E2015-01850-CCA-R3-PC, 2016 WL 5543259, at *8 (Tenn. Crim. App. at Knoxville, Sept. 29, 2016) (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)). To that end, this court has observed:

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

*State v. Matson*, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting *State v. Swanson*, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "appellate counsel's professional judgment with regard to which issues will best serve the [Petitioner] on appeal

should be given considerable deference," and this court "should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight." *Carpenter*, 126 S.W.3d at 887. Our supreme court has set forth the following "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue":

> 1) Were the omitted issues "significant and obvious"?
> 2) Was there arguably contrary authority on the omitted issues?
> 3) Were the omitted issues clearly stronger than those presented?
> 4) Were the omitted issues objected to at trial?
> 5) Were the trial court's rulings subject to deference on appeal?
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> 7) What was appellate counsel's level of experience and expertise?
> 8) Did the petitioner and appellate counsel meet and go over possible issues?
> 9) Is there evidence that counsel reviewed all the facts?
> 10) Were the omitted issues dealt with in other assignments of error?
> 11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Id*. at 888.

As the State notes, trial counsel raised approximately thirty-four issues on direct appeal. *See generally Davidson*, 509 S.W.3d at 170-71. However, as with many of the other alleged grounds of ineffective assistance of trial counsel, the Petitioner did not question his attorneys during the evidentiary hearing about why they chose not to include any other issue(s) in their brief on appeal. Thus, as the above-cited authority advises, this court must presume that counsel deliberately and strategically decided that the numerous issues they raised on appeal were those they considered as having the best chance of success. The Petitioner has not overcome that presumption. Thus, he is not entitled to relief on this ground.

III. *Imposition of the Death Penalty*

The Petitioner advances several grounds challenging the constitutionality of the death penalty. In addition to the stand-alone claims discussed herein, he argues that counsel were ineffective for failing to challenge on appeal the methods of execution in Tennessee and the imposition of the death sentence as a violation of international law. As will be shown, the Petitioner is not entitled to post-conviction relief on any of these grounds.

## A. *Hurst v. Florida*

The Petitioner argues that Tennessee's thirteenth juror rule violates the holding in *Hurst v. Florida*, 136 S. Ct. 616 (2016), because the rule requires that a trial judge "weigh in" on the jury's verdict in the penalty phase of a capital trial. However, this court has held that the *Hurst* holding is inapt as a challenge to the thirteenth juror rule. *Nicholas Todd Sutton v. State*, No. E2018-00877-CCA-R3-PD, 2020 WL 525169, at *7 (Tenn. Crim. App. at Knoxville, Jan. 31, 2020), *perm. app. denied*, (Tenn. Feb. 13, 2020). This issue is without merit.

## B. *Proportionality of Death Sentence*

The Petitioner cursorily claims that his sentence of death is disproportionate to the crimes committed in this case. This issue was previously determined by our supreme court during its proportionality review on direct appeal. *Davidson*, 509 S.W.3d at 223-27. The Petitioner is not entitled to relief on this ground. Similarly, his general challenge to the statutorily created appellate review process was also previously rejected on direct appeal. *Id.* at 244.

## C. *Sentencing Phase Jury Instructions*

The Petitioner also makes a general assertion that some of the jury instructions given during the sentencing phase violated his constitutional rights. Specifically, he argues that the instructions improperly required that the jury unanimously agree to a life sentence and the finding of mitigating circumstances and that the jury was instructed they were not required to make the ultimate determination of the appropriateness of the death sentence. However, those arguments were rejected on direct appeal. *Id.* at 242-43.

## D. *Grand Jury Review*

The Petitioner's argument that the aggravating circumstances sought by the State were not included in the indictment in violation of his constitutional rights also was rejected on direct appeal. *Id.* at 244-45.

## E. *Methods of Execution*

The Petitioner claims that lethal injection and electrocution, the two methods currently used in Tennessee, are unconstitutional. He also argues that counsel were ineffective for failing to challenge those methods. Counsel did raise an issue on direct appeal regarding the constitutionality of the lethal injection protocol, but the challenge was

unsuccessful. *Id.* at 243 (citing *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005)). Moreover, despite having been waived in this case, challenges to the use of the electric chair have long since been denied by the appellate courts in this state. *See, e.g., State v. Black*, 815 S.W.2d 166, 179 (Tenn. 1991). Thus, the Petitioner is not entitled to relief on his freestanding challenge to the methods of execution employed in this state or his challenge against counsel's effectiveness with regard to the presentation of the issue.

### F. *International Law*

The Petitioner contends that his convictions and death sentences violate his rights under various provisions of international law. He also alleges that his attorneys were ineffective for not raising these challenges earlier. Any standalone claim in this regard must be considered waived. Tenn. Code Ann. § 40-30-106(g). And though the Petitioner did not question counsel about their reason for not challenging the imposition of the death penalty under principles of international law, arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by our appellate courts. *See, e.g., State v. Odom*, 137 S.W.3d 572, 600 (Tenn. 2004). The Petitioner is not entitled to relief on this ground.

## IV. *Disparate Treatment Claims*

### A. *Sentences of Codefendant*

Under this heading, the Petitioner first argues that his death sentence for Mr. Newsom's death is unfair because codefendant Eric Boyd received a life sentence. The Petitioner asserts that Boyd shared at least the same level of culpability as the Petitioner in the murder of Mr. Newsom; however, because the State did not seek enhanced punishment for Boyd, the Petitioner's death sentence is disproportionate to Boyd's life sentence. Our supreme court has repeatedly rejected the argument that a death sentence is constitutionally disproportionate when a codefendant, who was involved in the same murder, received a lesser sentence. *See State v. Stephenson*, 195 S.W.3d 574, 595 (Tenn. 2006) (citing *State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004), *State v. Middlebrooks*, 995 S.W.2d 550 (Tenn. 1999), *State v. Cauthern*, 967 S.W.2d 726 (Tenn. 1998), and *State v. Henley*, 774 S.W.2d 908 (Tenn. 1989)); *State v. Carter*, 714 S.W.2d 241, 251 (Tenn. 1986) (citing *State v. Barnes*, 703 S.W.2d 611 (Tenn. 1985), *State v. King*, 694 S.W.2d 941 (Tenn. 1985), and *State v. Caruthers*, 676 S.W.2d 935 (Tenn. 1984)). In *Carter*, the court affirmed the defendant's death sentence because there "was clearly a rational basis" for the codefendant's lesser sentence. 714 S.W.2d at 251. Acknowledging that language in *Carter*, the court later ruled, however:

Moreover, where there is no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death was never imposed in a case with similar characteristics. On the contrary, our duty under the similarity standard is to assure that no [aberrant] death sentence is affirmed.

*State v. Bland*, 958 S.W.2d 651, 665 (Tenn. 1997). Indeed, our supreme court conducted its mandatory proportionality review of the Petitioner's death sentences on direct appeal in this case and concluded that they "were not imposed in any arbitrary fashion" or were "neither excessive nor disproportionate when compared to defendants in other cases." *Davidson*, 509 S.W.3d at 218-27. In doing so, the court reaffirmed the "precedent-seeking method of analysis" outlined in *Bland* and thus compared the Petitioner's case "with the cases of other defendants convicted of first degree murder in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life, life without parole, or death." *Id.* at 224; b*ut see id.* at n.13 (noting authoring judge's "support [of] a broader analysis that includes all first degree murder cases, including those in which the death penalty was not sought"). The court stated:

> In conducting a statutory comparative proportionality review, we do not search for proof that a defendant's sentence is "perfectly symmetrical" with the sentences imposed in all other first degree murder cases. [*State v.*] *Godsey*, 60 S.W.3d [759] at 782 [Tenn. 2001]. The Court's function is not to second-guess the jury or act as a "super jury," but to identify and invalidate a death sentence that is an aberration. *Id.* A sentence of death is disproportionate if "the case taken as a whole is plainly lacking in circumstances consistent with those cases where the death penalty has been imposed." [*State v.*] *Pruitt*, 415 S.W.3d [180] at 214 [Tenn. 2013] (quoting *Bland*, 958 S.W.2d at 668); *see also Godsey*, 60 S.W.3d at 782.

*Id.* As noted above, the Petitioner was tried in 2009, but Boyd was not tried by the State for his involvement in the crimes until 2019. Thus, our supreme court did not have the benefit of reviewing Boyd's case at that time. Nevertheless, Boyd's case would not have been included in the court's proportionality review because the State did not seek the death penalty against him. Our supreme court has held, however, that a prosecutor's discretion in selecting candidates for the death penalty does not result in any constitutional deprivation. *State v. McKinney*, 74 S.W.3d 291, 320 (Tenn. 2002). The Petitioner is not entitled to relief on this issue.

B. *Inconsistent Theories of Prosecution*

Next, the Petitioner argues that the State's inconsistent theories of prosecution employed during his trial versus that of Boyd's trial violates his constitutional rights. As the Petitioner observes, the State presented proof in Boyd's trial that Boyd killed Mr. Newsom and burned his body after death but did not offer that proof in the Petitioner's trial.

As this court has noted, "our supreme court has recognized the possibility that pursuit of inconsistent theories at the separate trials of co-defendants may have due process implications." *Berry v. State*, 366 S.W.3d 160, 182 (Tenn. Crim. App. 2011). However, "the court has steadfastly declined to adopt the rule of *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), that '"core" inconsistencies violate Due Process guarantees.'" *Id.* (quoting *State v. Housler*, 193 S.W.3d 476, 492 (Tenn. 2006)).

As noted elsewhere in this opinion, Thomas testified in Boyd's trial that Boyd killed Mr. Newsom and set his body on fire and that the Petitioner was not present when those events occurred. There was no such direct testimony in the Petitioner's trial. Nevertheless, our supreme court, after discussing the law of criminal responsibility, found the evidence sufficient to support the Petitioner's conviction for the murder of Mr. Newsom. *Davidson*, 509 S.W.3d at 212-14. Again, the Petitioner was tried approximately ten years before Boyd. There is no indication that the State was aware in 2009 that Thomas would be willing to testify as he did in Boyd's trial in 2019. The State simply did not present inconsistent theories at the two trials sufficient enough to warrant post-conviction relief. The Petitioner is not entitled to relief on this issue.

## V. *Judge Baumgartner*

The Petitioner's challenges to the post-conviction court's denial of access to records related to Judge Baumgartner and to trial counsel's presentation of the issue during the motion for new trial hearing have been addressed above. The Petitioner also makes an unsubstantiated suggestion that Judge Baumgartner "delegate[ed] his judicial authority to a law clerk or capital case attorney" and thus deprived the Petitioner of several constitutional rights. To reiterate, any issue as it relates to Judge Baumgartner's alleged impairment during the Petitioner's trial has been previously determined. *See Letalvis Cobbins et al.,* No. E2012-00448-SC-R10-DD (order); *Davidson*, 509 S.W.3d at 227-29. Without any supporting proof in the record, the Petitioner's suggestion that the trial judge delegated his duties is patently frivolous. He is not entitled to relief on this ground.

## VI. *Cumulative Error*

Finally, the Petitioner contends that the many individual errors he has alleged in support of post-conviction relief, when examined cumulatively, warrant the granting of a

new trial and/or sentencing hearing. The cumulative error doctrine applies only where there has been more than one actual error, which the Petitioner has failed to establish in this case. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Thus, his cumulative error argument is without merit.

## Error Coram Nobis

Initially, we note that the Petitioner did not file his petition for a writ of error coram nobis within the applicable one-year statute of limitations. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999) (holding error coram nobis petition in criminal cases must be filed within one year of date of final judgment of conviction in trial court). However, the coram nobis court determined that the limitations period should be tolled in this case. *See Workman v. State*, 41 S.W.3d 100 (Tenn. 2001) (discussing equitable tolling of limitations period). As the coram nobis court found, the Petitioner did not discover the fact that Thomas was willing to testify at Boyd's trial until September 2018 and, thus, was "without fault" in failing to present the claim within the applicable one-year statute of limitations. Neither party challenges that ruling on appeal. Therefore, we will only address the merits of the issues raised on appeal.

*Evidentiary Hearing Testimony*

According to Thomas, in the morning hours of January 6, 2007, Cobbins talked about the Petitioner's plan to steal or "get" a car. Thomas, Cobbins, Coleman, and the Petitioner were present during that conversation. At some point, Cobbins and the Petitioner left the Petitioner's house while Coleman and Thomas remained. Later that evening, Cobbins, Boyd, and the Petitioner returned to the house with Ms. Christian and Mr. Newsom. Both victims had their hands tied, and Mr. Newsom's "head or eyes" were covered. Cobbins entered the house first and told Thomas to "get up. Come on. Let's go. Get your stuff." Thomas followed Cobbins through the kitchen and into the back bedroom. The Petitioner, who had followed Cobbins into the house, led Ms. Christian into the front bedroom. Thomas testified that he did not see or hear Ms. Christian again the rest of that weekend. Boyd stayed in the living room with Mr. Newsom nearby. Thomas realized the victims had been kidnapped.

Thomas eventually returned to the living room to find Boyd and the Petitioner there. The Petitioner told Thomas to "go with him," referring to Boyd. Thomas asked the Petitioner, "What's up? What's going on?" The Petitioner just replied, "Go with him." At that point, Thomas did not know why the Petitioner had told him to go with Boyd and did not know Boyd was going to take Mr. Newsom with them. Thomas did not see the Petitioner give Boyd a gas can. Boyd and Thomas put Mr. Newsom into Ms. Christian's vehicle, drove around "basically" in a circle, and ended up behind a warehouse. Mr.

Newsom jumped out of the vehicle. Boyd directed Thomas to "help him or whatnot," but Thomas "just kind of shook [his] head, like, no." Boyd then grabbed Mr. Newsom and walked him across a drainage ditch. Boyd led Mr. Newsom behind a stand of trees, and Thomas saw three flashes. Boyd then dragged Mr. Newsom's body "on the other side of the warehouse" and returned to the vehicle to retrieve a gas can. A "couple minutes later," Thomas saw a fire. Boyd returned to the vehicle, and they drove back to the Petitioner's house. According to Thomas, Boyd did not talk "about what was going on" during their excursion.

Thomas testified that when he and Boyd entered the Petitioner's house, Boyd told the Petitioner "something, like, okay. That's -- it's don- -- that's done or something to that effect." Thomas initially testified that the Petitioner said "nothing" in response to Boyd's comment. However, Thomas then testified, "I mean, probably just okay . . . ." Thomas explained, "I mean, Mr. Boyd said, like, that's done. And then [the Petitioner] – I mean, I can't say exactly what he said, 'cause, I mean, I didn't just hear it, but it sounded like, okay or something like that." Thomas said he "couldn't be sure what exactly [the Petitioner] said." Cobbins also was at the house when Boyd and Thomas returned. Cobbins asked Thomas what happened, and Thomas replied that "he just killed the dude." According to Thomas, Cobbins reacted as if he did not know that was going to happen. Thomas did not hear anyone discuss Mr. Newsom again. Thomas also testified that he never heard the Petitioner directly tell anyone "to murder Christopher Newsom" or "to set Christopher Newsom's body on fire." He also did not hear anyone tell the Petitioner that they were going to kill Mr. Newsom. Thomas said he would not have gone with Boyd if he had known Boyd was going to kill Mr. Newsom. Thomas further said he did not know Boyd was going to kill Mr. Newsom until "[p]robably around the time we pulled up behind the warehouse."

Thomas testified that after his arrest in 2007, he did not tell the police about all of those details because he "didn't want to get drug into it even more than it [sic] was." Thomas also did not inform the police that he saw Boyd kill Mr. Newsom and that the Petitioner was not present. He did not reveal that information to the State until sometime in 2018. Thomas said that he had not seen the Petitioner since "probably 2008" and that the Petitioner did not ask him to come forward with the new information. Thomas did not testify at his own trials.

On cross-examination, Thomas testified that he knew the Petitioner intended to steal a car that day. He had no idea what Boyd and the Petitioner discussed during their abduction of the victims, and he did not know what crimes they may have committed against the victims before they returned to the Petitioner's house. Similarly, Thomas did not know what crimes were committed against Ms. Christian after Thomas and Boyd left the Petitioner's house with Mr. Newsom. Thomas did not know how the Petitioner came

to possess Mr. Newsom's shoes or why Mr. Newsom's baseball caps, driver's license, and car keys were later found inside the Petitioner's house.

Thomas testified that he did not know why Boyd told the Petitioner that "it's done" after Boyd killed Mr. Newsom. However, Thomas confirmed that Boyd made that statement directly to the Petitioner; Boyd did not say it to Cobbins or Coleman. Furthermore, when Thomas and Boyd returned to the Petitioner's house, Thomas did not hear the Petitioner ask for Mr. Newsom's whereabouts. Thomas testified that at some point thereafter, the Petitioner drove everyone but Boyd in Ms. Christian's vehicle to another individual's house. The Petitioner also was driving when they returned to his house about an hour later. The next day, Thomas left the house with Cobbins and Coleman while the Petitioner remained in the home with Ms. Christian. Thomas said he did not know what crimes the Petitioner may have committed against Ms. Christian during that time.

When questioned by the coram nobis court, Thomas said that "the thought may have – might have crossed [his] mind" but that he did not ask Boyd where they were taking Mr. Newsom. The following exchange then occurred:

Q. Well, here you've got the victim of a carjacking and a kidnapping in a car -- a vehicle with you and you're not even curious what you're going to do with him?

A. I mean, only -- I mean, as far as I knew, he could have drove him -- could have been driving him somewhere to, I guess --

Q. Let him go?

A. I mean, he could have. I mean, I didn't know exactly what was going to happen after we left inside the car.

Q. Well, under the circumstances, wasn't it clear that you weren't going to turn him loose?

A. I mean, it could have been, but, I mean, I - I didn't know what the plan was, to either go ditch him somewhere or go do what had happened.

Q. Well, Ms. Christian was back at the house, you knew that?

A. Correct.

Q. So it made no sense to turn Mr. Newsom loose. He could contact the police and it would be all over, correct?

A. Yes.

Q. So what other alternative was there, other than he was going to be killed?

A. I mean, like I say, I don't -- I didn't know that he was going to be killed. I mean, I didn't know what reasoning was going to be when we took him to the car and drove over there.

Q. And it never crossed your mind, when you left with him, that the mission was to kill Mr. Newsom?

A. No.

Q. But you're not – it's not clear that you surely knew you weren't going to turn him loose?

A. I mean, I didn't know what was going to happen until, like, we pulled up behind the warehouse.

Attorney David Eldridge was the only other witness to testify at the coram nobis hearing. He said that he had reviewed the various statements the codefendants gave the police after their arrests and that Thomas did not say Thomas and Boyd were alone with Mr. Newsom when Mr. Newsom was killed. Eldridge did not learn about Thomas's new version of the events until Thomas testified at Boyd's state trial in 2019. According to Eldridge, each of the codefendants attempted to lay blame on one another. Therefore, none of the attorneys would have allowed their clients to be interviewed by the codefendants' attorneys. The Petitioner's theory of defense attempted to create doubt as to why the victims were present at the Petitioner's house and then attempted to "point the finger" at his codefendants for what eventually happened. Eldridge admitted that Thomas's testimony about the Petitioner's planning to steal a car and returning to the house with the victims' hands tied would not have helped the Petitioner's defense. However, Eldridge would have wanted to explore thoroughly Thomas's recent testimony regarding the body mutilation aggravating circumstance. Eldridge could not state with certainty that he would have called Thomas as a witness at trial.

*Issues*

- 85 -

The Petitioner argued to the coram nobis court that Thomas's testimony may have affected the jury's verdicts for the premeditated first degree murders of Mr. Newsom and Ms. Christian and, therefore, may have affected the death sentences imposed for their murders. The Petitioner also argues that the coram nobis court failed to consider how Thomas's testimony may have affected his conviction of facilitating the aggravated rape of Mr. Newsom. Finally, the Petitioner asserts that the coram nobis court erred by dismissing his claim that imposition of the death penalty, in light of the Thomas testimony, violates his constitutional rights to due process and to be free from cruel and unusual punishment.

*Burden of Proof and Standard of Review*

The writ of error coram nobis is a post-judgment mechanism that has a long history in both civil and criminal law in the State of Tennessee. *See, e.g., Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018). It is "an extraordinary remedy known more for its denial than its approval" and it "fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 666, 672 (Tenn. 1999). The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 for criminal cases and provides, in pertinent part, as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b).

Our supreme court has outlined the procedure a coram nobis court must follow when considering a petition seeking a writ of error coram nobis. First, the court must determine whether the petition was timely filed and, if not, whether equitable tolling of the statute of limitations is warranted. *Nunley*, 552 S.W.3d at 828-29. Again, although the petition in this case was not filed within one year of the final judgment in the trial court, the coram nobis court concluded that tolling of the statute was warranted.

> [T]he trial judge must [then] consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without

fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007) (emphasis in original). In other words, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *Id*.

The decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016). As discussed earlier:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. Thus, it does not permit reviewing courts to second-guess the court below . . . or to substitute their discretion for the [trial] court's. The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny.

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc.*, 312 S.W.3d at 524 (citations omitted). Again, the abuse of discretion standard of review "does not permit an appellate court to substitute its judgment for that of the trial court." *McCaleb*, 582 S.W.3d at 186. "Because, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *Id.* (citation omitted).

Similarly, "[t]he assessment of witness credibility is entrusted to the sound discretion of the trial court." *Johnson v. State*, 370 S.W.3d 694, 700 (Tenn. Crim. App. 2011). Thus, this court will not reassess the coram nobis court's credibility findings. Moreover, "the weight and value to be given the evidence as well as all factual issues raised by the evidence are resolved by the trier of fact, and not in the appellate courts." *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

I. *Guilt Phase*

The Petitioner is only challenging the verdicts in which the jury found him guilty of first degree premeditated murder. He does not challenge the jury's verdicts finding him guilty of fourteen counts of felony first degree murder. Thus, as the coram nobis court concluded, even if the newly discovered evidence at issue were considered by the jury, the Petitioner would still stand convicted on the many theories of felony murder and "a new trial on the premeditated first degree murder count would provide little practical relief to Petitioner."

A. *First Degree Premeditated Murder of Mr. Newsom*

The Petitioner argues that Thomas's testimony that Boyd, not the Petitioner, shot Mr. Newsom may have the caused the jury to reach a different verdict as to the first degree premeditated murder of Mr. Newsom. The coram nobis court disagreed, stating,

> [T]his Court finds there is not a reasonable basis to conclude the jury may
> have found [the Petitioner] not guilty of premeditated first degree murder. In
> the Court's view, [the Petitioner] was clearly an accomplice in Mr.
> Newsom's premeditated murder. Mr. Thomas's testimony at the coram
> nobis hearing makes clear that [the Petitioner] ordered Mr. Newsom's
> killing. [The Petitioner] ordered Mr. Thomas to go with Mr. Boyd and Mr.
> Newsom before Mr. Newsom's death; Mr. Boyd's post-killing comment
> "that's taken care of," spoken to Mr. Davidson after Mr. Boyd and Mr.
> Thomas returned, followed by the Petitioner's response of "okay," makes
> that fact evident. [The Petitioner] was clearly an accomplice in Mr.
> Newsom's killing and, therefore, criminally responsible for the murder, as

- 88 -

Petitioner ordered the killing. [FN: When [the Petitioner] was arrested, he was wearing Mr. Newsom's shoes. There was also proof presented that he had used Mr. Newsom's phone. *State v. Davidson*, 509 S.W.3d at 214.]. Furthermore, [the Petitioner] is criminally responsible for the acts of his codefendants in all aspects of the criminal enterprise related to the kidnapping, sexual assault, and murders of the two victims. This would include the killing of Mr. Newsom by a co-defendant.

In sum, this Court finds there is not a reasonable basis to conclude the result of [the Petitioner's] trial may have been different as to the premeditated murder count. Even with Mr. Thomas's newly-available testimony, the totality of the evidence produced at [the Petitioner's] trial was more than sufficient for the jury to find [the Petitioner] guilty of premeditated first degree murder under a criminal responsibility theory. Petitioner is not entitled to relief on this issue.

The Petitioner contends that the coram nobis court reached its conclusion on a "clearly erroneous assessment of the evidence." Although the Petitioner recognizes the law of criminal responsibility, he argues that Thomas's testimony did not actually establish that the Petitioner "ordered" the killing of Mr. Newsom, as found by the trial court. The Petitioner asserts that the coram nobis court "filled the missing gaps in Thomas's recollection with conjecture tailored to support its theory that [the Petitioner] ordered the killing." He further asserts that the record "does not support the lower court's use of Thomas's vague recollections as the foundation for its conclusion that [the Petitioner] ordered [Mr.] Newsom's death." The State counters that the evidence shows that the Petitioner initiated the idea to steal the vehicle that led to the murders, appeared to have known Boyd was going to kill Mr. Newsom, and then benefitted from the proceeds of the crimes.

Again, this court reviews the coram nobis court's ruling under an abuse of discretion standard. This standard "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Med., Inc.*, 312 S.W.3d at 524. Although a "clearly erroneous assessment of the evidence" results in an abuse of discretion, this court, as the reviewing court, must determine "whether the factual basis for the decision is properly supported by evidence in the record" and "whether the [trial] court's decision was within the range of acceptable alternative dispositions." *Id.*

We disagree with the Petitioner's assertion that the coram nobis court's assessment of Thomas's testimony was clearly erroneous. The coram nobis court stated that it "accredits Thomas's testimony that [the Petitioner] ordered the killing of Mr. Newsom, and that Boyd was the person who killed Mr. Newsom and mutilated his body. [The

Petitioner] was not physically present when Mr. Newsom was shot." However, the coram nobis court stated that it "ha[d] difficulty in crediting all of Mr. Thomas's testimony given the Court's knowledge of his role in these crimes." That was the coram nobis court's prerogative, and we will not question the coram nobis court's credibility findings. *Johnson*, 370 S.W.3d at 700.

Thomas admitted that he was not present with the Petitioner, Boyd, and Cobbins during the entire criminal episode. Thus, he had no idea what was said or done outside his presence. Nevertheless, Thomas himself was convicted of thirty-eight criminal charges, including the first degree murders of both victims, for his role in the crimes. *George Geovonni Thomas*, No. E2013-01738-CCA-R3-CD, 2015 WL 513583, at *1. In our view, Thomas's testimony established that the Petitioner at least directed the killing of Mr. Newsom when the Petitioner told Thomas, who at that point realized the victims had been kidnapped, to accompany Boyd and then acknowledged Boyd's comment "that's done or something to that effect" upon their return to the house. Therefore, the Petitioner was criminally responsible for the first degree premeditated murder of Mr. Newsom.

The Petitioner seems to suggest that the courts must examine Thomas's coram nobis testimony in a vacuum. However, all of the evidence on record, including that introduced at trial, must be considered in order to determine whether the new evidence may have led to a different result. *Vasques*, 221 S.W.3d at 527. In his brief, the Petitioner offers different scenarios as to why, in light of Thomas's testimony, he may not have been directly involved in the killing of Mr. Newsom. Again, though, the coram nobis court did not find all of Thomas's testimony credible. Moreover, the Petitioner's scenarios ignore the fact that circumstantial evidence is treated no differently than direct evidence and that guilt may be based on circumstantial evidence alone. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). It also ignores the fact that the totality of the evidence, including Thomas's testimony, was more than sufficient for the jury to find the Petitioner criminally responsible for Mr. Newsom's killing. The Petitioner was an active member of a group of individuals who kidnapped, raped, and murdered the two victims. All of the crimes occurred over the course of one weekend, and the Petitioner's house served as the base camp. The Petitioner was wearing Mr. Newsom's shoes when he was arrested, and some of Mr. Newsom's other belongings were found in the Petitioner's house.

> [O]ne "is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (1997). "Each party to an offense may be charged with commission of the offense." Tenn. Code Ann. § 39-11-401(b). Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another. *State v. Lemacks*, 996

S.W.2d 166, 170 (Tenn. 1999). A person may be criminally responsible for an offense committed by the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense [.]" Tenn. Code Ann. § 39-11-402(2) (1997).

> "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). Further, no specific act or deed need be demonstrated. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). The legislative intent behind the criminal responsibility statutes was clearly to "embrace the common law principles governing aiders and abettors and accessories before the fact." *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997).

*Id.* at 386.

Upon review, we conclude that the coram nobis court did not abuse its discretion by denying the Petitioner relief on this claim. Even assuming Thomas testified at the Petitioner's trial as he did at the coram nobis hearing, there is no reasonable basis to conclude the jury might have reached a different verdict as to the charge of the first degree premeditated murder of Mr. Newsom.

### B. *First Degree Premeditated Murder of Ms. Christian*

The Petitioner also argues that Thomas's testimony raised questions about the Petitioner's conviction for the first degree premeditated murder of Ms. Christian. He suggests that Thomas's testimony established Boyd as an alternative suspect for Ms. Christian's murder because, according to Thomas, Boyd apparently remained alone with Ms. Christian for nearly an hour inside the Petitioner's house and Thomas did not see her again after that. The coram nobis court disagreed, stating,

> The evidence produced at trial which formed the basis of [the Petitioner's] convictions for the offenses involving Ms. Christian was overwhelming and

more than sufficient for the jury to find [the Petitioner] guilty of those offenses beyond a reasonable doubt. *See State v. Davidson*, 509 S.W.2d at 212-17. Given the time that passed between the two victims' murders and the fact that the victims were killed in two separate locations, there is no doubt the jury would have been able to sort through the evidence and return first degree murder verdicts against [the Petitioner] for the killing of Ms. Christian. There is not a reasonable basis to conclude the Thomas testimony might have led to a different outcome as to the counts relating to Ms. Christian, and therefore Petitioner is not entitled to relief on this issue.

Again, the coram nobis court did not accredit all of Thomas's testimony. However, Thomas testified that after the Petitioner initially led Ms. Christian into the front bedroom of the Petitioner's house, Thomas did not see or hear her again the rest of that weekend. Thomas further testified that the Petitioner remained alone in the house with Ms. Christian for some time on Sunday. Finally, Thomas did not know what crimes the Petitioner may have committed against Ms. Christian outside of his presence. He certainly did not testify that he witnessed anyone else kill Ms. Christian.

Based upon our review of the Thomas testimony, the coram nobis court did not err by concluding that there was no reasonable basis the jury may have reached a different verdict as to the first degree premeditated murder charge for Ms. Christian's killing. The Petitioner does not dispute that his conviction may have been based upon a theory of criminal responsibility. Regardless, as the State maintains, "[T]he theoretical possibility that Boyd killed [Ms. Christian] pales against the overwhelming evidence of the [P]etitioner's guilt." The Petitioner's semen, not Boyd's, was found in and on Ms. Christian. His prints and only his prints were found on the plastic bags in which her body was found. At the time of his arrest, the Petitioner possessed some of Ms. Christian's belongings. The killing occurred in the Petitioner's house. Thomas did not see who killed her. This court is not convinced that Thomas's testimony may have led to a different result at trial. The Petitioner is not entitled to coram nobis relief on this claim.

C. *Facilitation of the Aggravated Rape of Mr. Newsom*

The Petitioner was charged with three counts of aggravated rape of Mr. Newsom, but the jury instead found him guilty of three counts of facilitating the aggravated rape of Mr. Newsom. *Davidson*, 509 S.W.3d at 180. On appeal, the Petitioner argues that the coram nobis court failed to consider how Thomas's testimony may have affected those verdicts. However, the Petitioner did not raise this claim in his coram nobis petition and raises it for the first time in his appellate brief before this court. Thus, the State argues waiver. The Petitioner did not respond to the State's waiver argument, and we agree with the State that the Petitioner has waived the issue by failing to present it below. *See, e.g.,*

*State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017); *State v. Greg Lance*, No. M2011-01214-CCA-R3-CO, 2012 WL 6139891, at *5 (Tenn. Crim. App. at Nashville, Dec. 11, 2012).

II. *Penalty Phase*

The jury found the existence of three aggravating circumstances for the murder of each victim: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding, interfering, or preventing a lawful arrest; and (3) the murder was committed during the perpetration of another felony. *Davidson*, 509 S.W.3d at 219 (citing Tenn. Code Ann. § 39-13-204(i)(5), (6), (7)). The jury found the existence of one additional aggravating factor for the murder of Mr. Newsom: the defendant knowingly mutilated the body of the victim after death. *Id.* (citing Tenn. Code Ann. § 39-13-204(i)(13)). As noted elsewhere in this opinion, the State concedes that the application of the (i)(13) aggravating circumstance cannot stand in light of the Thomas testimony. *See Johnson*, 38 S.W.3d at 63 (aggravating circumstance focusing on defendant's actions and intent, rather than circumstances of killing, cannot be applied vicariously). This court already has conducted a harmless error analysis and has concluded beyond a reasonable doubt that the death sentence imposed by the jury for the murder of Mr. Newsom was not affected by the application of that invalid aggravating circumstance. The Petitioner similarly argues in support of coram nobis relief that the jury *may have* returned a sentence less than death for the murder of each victim if the jury had known about Thomas's testimony.

The State initially argues that a claim regarding new sentencing phase evidence is not a cognizable basis for coram nobis relief. Although the State did not raise this issue in the coram nobis court, the State now relies on our supreme court's opinions in *Frazier v. State*, 495 S.W.3d 246 (Tenn. 2016), and *Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018), in support of its position. The Petitioner replies that this court should rule on this issue in accordance with our supreme court's opinion in *Freshwater v. State*, 354 S.W.3d 746 (Tenn. Crim. App. 2011) ("*Freshwater III*"). In order to properly address this issue, we will summarize those cases and the applicable statutory provisions.

In *Frazier*, our supreme court held that coram nobis relief was unavailable to a criminal defendant who pled guilty to a charged offense. 495 S.W.3d at 248 (overturning its recent opinion *Wlodarz v. State*, 361 S.W.3d 490 (Tenn. 2012)). Applying the "usual rules of statutory construction," the court "emphasiz[ed] that the coram nobis statute made repeated references to the words 'evidence,' 'litigated,' and 'trial.'" *Id*. at 249. The court further observed that "[s]ignificantly, the coram nobis statute makes no reference to the word 'plea.'" *Id*. In further support of its reasoning, the court stated that

[t]he plain and ordinary meaning of the term "litigated on [or at] the trial" in the context of criminal prosecutions refers to a contested proceeding involving the submission of evidence to a fact-finder who then must assess and weigh the proof in light of the applicable law and arrive at a verdict of guilt or acquittal.

*Id*. at 250 (citing *Wlodarz*, 361 S.W.3d at 509 (Koch, J., concurring in result)). The court then highlighted the fact that "in addition to being non-adversarial, guilty plea hearings do not typically involve 'evidence.'" *Id*. at 251. The court compared that fact with the prerequisite in error coram nobis proceedings that a defendant must come forward with newly discovered *evidence* challenging the trial evidence used to convict him or her. *Id*.

The *Frazier* court also noted that a defendant who enters a plea waives his or her right to a trial and, thus, his or her right to contest the evidence which may have been used against him or her. *Id*. "Indeed, a criminal defendant pleads guilty in order to *avoid* a trial, frequently because the prosecution has agreed to accept a plea to a lesser offense than that with which the defendant was originally charged and/or because the prosecution has agreed to a sentence that is less onerous than the sentence the trial court might impose without a plea bargain." *Id*. at 251-52 (emphasis in original). To that end, the court explained that a guilty plea may only be accepted by a trial court after significant safeguards are taken to ensure the plea is voluntary, knowing and intelligent. *Id*. at 253. Moreover, "if the defendant's plea is allegedly infirm, he [or she] has several [other] avenues for seeking redress, including a motion to withdraw his [or her] plea, *see* Tenn. R. Crim. P. 32(f), and a claim for post-conviction relief, *see* Tenn. Code Ann. § 40-30-103 (2012)." *Id*. at 253.

In *Nunley*, our supreme court held that "an error coram nobis proceeding is not the appropriate procedural vehicle for obtaining relief on the ground that the petitioner suffered a constitutional due process violation under *Brady* [*v. Maryland*, 373 U.S. 83 (1963)]." 552 S.W.3d at 806. In its analysis, the court distinguished the elements required for newly discovered evidence in the coram nobis context with the elements required for exculpatory evidence suppressed by the State under a *Brady* analysis. *Id*. at 816-17. As the Petitioner notes in his coram nobis brief, the distinction between newly discovered evidence and exculpatory evidence suppressed by the State "is subtle but important." Our supreme court recognized that the coram nobis statute and the *Brady* rule "share a similar overall purpose; both are intended to ensure a fair and reliable determination of the petitioner's criminal liability for the offense with which he was charged." *Id*. at 817. However, the court explained that "the two are different animals, with independent bases, distinct standards, and differing available remedies." *Id*. The court ultimately concluded that the "appropriate procedural mechanism" for seeking relief on a *Brady* violation, *i.e.*, exculpatory evidence withheld by the State, is a post-conviction proceeding, not an coram nobis proceeding. *Id*. at 819. However, the court clarified that "[i]n cases in which a petitioner seeks relief via a

petition for writ of error coram nobis as well as post-conviction proceedings, both based on newly discovered evidence improperly suppressed by prosecutors at trial, each claim for relief should be presented and evaluated on a separate track, so to speak -- the first in accordance with the coram nobis statutes, and the second for a constitutional *Brady* violation under a petition for post-conviction relief." *Id*. at 819-20. Thus, and importantly, our supreme court maintained that a defendant may still seek coram nobis relief based upon newly discovered evidence. In fact, as discussed earlier in this opinion, the Petitioner did also attempt to litigate his newly discovered evidence claim in his post-conviction proceeding.

The *Nunley* court discussed the case of *Freshwater v. State*, 160 S.W.3d 548 (Tenn. Crim. App. 2004) ("*Freshwater I*"). As the Petitioner aptly recognizes, the *Freshwater* line of cases has a long and complicated history. In 1969, Margo Freshwater was convicted of first degree murder and, as was the law at that time, sentenced by the jury to ninety-nine years in prison. *Id*. at 747. She escaped from prison in 1970 and remained at large until her arrest in 2002. *Id*. After Freshwater was imprisoned again in Tennessee, she pursued coram nobis relief on newly discovered evidence under the guise of *Brady*. *Id*. at 748-49. The coram nobis court dismissed the petition because it was untimely and, upon the petitioner's first appeal of that ruling, this court concluded that due process required tolling of the statute of limitations. *Freshwater I*, 160 S.W.3d at 550. This court agreed that "'coram nobis is not a forum for the determination of a constitutional issue'" but determined that the newly discovered evidence raised by Freshwater in the context of a *Brady* claim could be litigated through a petition for a writ of error coram nobis. *Id*. at 555. Upon remand, the coram nobis court conducted a hearing and denied relief. On appeal, this court determined that the coram nobis court utilized an incorrect standard in analyzing Freshwater's claim and again remanded the matter for further proceedings. *Margo Freshwater v. State*, No. W2006-01758-CCA-OT-CO, 2008 WL 4560242 (Tenn. Crim. App. at Jackson, Oct. 8, 2008) ("*Freshwater II*"). Following the second remand, the coram nobis court again denied relief. In *Freshwater III*, this court "agree[d] with the coram nobis court that, even believing the petitioner's version of the events, jurors reasonably could have found her guilty of the crime with which she was charged." 354 S.W.3d at 762. "However, since this trial occurred at a time when jurors determined both guilt or innocence as well as the sentence," this court next "determine[d] whether a reasonable basis exist[ed] for concluding that, had the jurors known that [the petitioner's codefendant] said he was the sole shooter, they still would have set [the petitioner's] sentence at ninety-nine years, rather than the twenty-year minimum." *Id*. Applying our supreme court's holding in *Vasques*, 221 S.W.3d at 527, this court concluded that "there is a 'reasonable probability' that the petitioner would not have received a sentence of ninety-nine years" and, thus, remanded the case for a new trial. *Id*. at 763.

In *Nunley*, our supreme court stated that *Freshwater I* "mischaracterized *Workman* in a way that appeared to conflate a constitutional claim under *Brady* with a statutory *coram nobis* claim based on newly discovered evidence previously withheld by the State." 552 S.W.3d at 814. The court then observed, as discussed above, that "the distinctions between these two types of claim are nuanced but significant." *Id*. Although our supreme court abrogated the suggestion in *Freshwater I* that a true *Brady*-like constitutional claim may be raised in an error coram nobis petition, it otherwise held that

> [i]f the newly discovered evidence that is the subject of an error coram nobis petition happens to also be material information favorable to the defense that the State improperly suppressed at trial (sometimes referred to as '*Brady*' evidence), the claim must be evaluated in accordance with the requirements of the *coram nobis* statutes.

*Id*. at 819. That is exactly what happened in *Freshwater III*.

The State argues that "[e]vidence intended solely to apply to a sentencing hearing, even a capital one, does not pertain to the question of guilt or acquittal, only to the punishment to be given after the guilt has already been found." As the Petitioner rightly observes, however, "The sentencing phase of a capital trial, just as the guilt portion of the trial, involves litigating matters through the presentation of evidence before a factfinding jury." The statute governing "[s]entencing for first degree murder" sets forth the procedure to employed during the second part of a capital trial:

> Upon a trial for first degree murder, should the jury find the defendant guilty of first degree murder, it shall not fix punishment as part of the verdict, but the jury shall fix the punishment in a separate sentencing hearing to determine whether the defendant shall be sentenced to death, to imprisonment for life without possibility of parole, or to imprisonment for life. The separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt, *subject to the provisions of subsection (k) relating to certain retrials on punishment.*

Tenn. Code Ann. § 39-13-204(a) (emphasis added). The State, having filed its notice of intent to seek enhanced punishment, must then prove its case to the jury. *See, e.g.*, Tenn. Code Ann. § 39-13-204(f)(1) ("If the jury unanimously determines that no statutory aggravating circumstance has been *proven by the state beyond a reasonable doubt*, the sentence shall be imprisonment for life.") (emphasis added). Attorneys for both parties are allowed to make opening and closing arguments, relevant evidence may be presented by either party, the court must instruct the jury about how to weigh the evidence presented,

and the jury must enter its *verdict* on forms provided by the court. Tenn. Code Ann. § 39-13-204(b)-(e). Finally, and most importantly for the discussion herein:

> Upon motion for a new trial, after a conviction of first degree murder, if the court finds error in the trial determining guilt, a new trial on both guilt and sentencing shall be held; *but if the court finds error alone in the trial determining punishment, a new trial on the issue of punishment alone shall be held by a new jury empanelled for that purpose.* If the trial court, or any other court with jurisdiction to do so, orders that a defendant convicted of first degree murder, whether the sentence is death, imprisonment for life without possibility of parole or imprisonment for life, be granted a *new trial, either as to guilt or punishment, or both, the new trial* shall include the possible punishments of death, imprisonment for life without possibility of parole or imprisonment for life.

Tenn. Code Ann. § 39-13-204(k) (emphasis added). Moreover, it is well-established jurisprudence that capital cases may be remanded for a new trial solely as to sentencing. *See, e.g., State v. Harris*, 919 S.W.2d 323 (Tenn. 1996) (discussing double jeopardy concerns in capital sentencing retrials).

Having considered all of this authority, we disagree with the State's position that coram nobis relief is not available to a petitioner seeking a new sentencing hearing in a capital case based on newly discovered evidence. Initially, we note that neither *Frazier* nor *Nunley*, upon which the State relies, were capital cases. In *Frazier*, our supreme court "emphasiz[ed] that the coram nobis statute makes repeated references to words such as 'evidence,' 'litigated,' and 'trial.'" 495 S.W.3d at 248. So too does the section of our Code that governs sentencing in a capital case. Tenn. Code Ann. § 39-13-204 ("jury," "opening statement," "closing argument," "evidence," "instructions," "deliberations," "verdict," "reasonable doubt," "new trial."). Moreover, unlike the petitioner in *Frazier*, the Petitioner in the present case did not plead guilty. As the supreme court emphasized, "The plain and ordinary meaning of the term 'litigated on [or at] the trial' in the context of criminal prosecutions refers to a contested proceeding involving the submission of evidence to a fact-finder who then must assess and weigh the proof in light of the applicable law and arrive at a verdict of guilt or acquittal." 495 S.W.3d at 250. The sentencing phase of a capital trial is just such a contested proceeding. Tenn. Code Ann. § 39-13-204; *see Harris*, 919 S.W.2d at 328 (commenting on "acquittal" of death penalty based on jury's decision to impose life sentence).

Additionally, the Petitioner in this case is not advancing a traditional *Brady* claim. As *Nunley* instructs,

> If the newly discovered evidence that is the subject of an error *coram nobis* petition happens to also be material information favorable to the defense that the State improperly suppressed at trial (sometimes referred to as '*Brady*' evidence), the claim must be evaluated in accordance with the requirements of the *coram nobis* statutes.

552 S.W.3d at 819. And, *Nunley* did not overrule *Freshwater III*. Finally, the remedy for a successful coram nobis petition is a new trial. Tenn. Code Ann. § 40-26-105(c) ("and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause"). That is the same remedy the statute governing sentencing in a capital case provides. Tenn. Code Ann. § 39-13-204(k) ("if the court finds error alone in the trial determining punishment, a new trial on the issue of punishment alone shall be held"). Thus, the coram nobis court in this case properly reviewed the impact of the Thomas testimony as it relates to the Petitioner's death sentences.

The Petitioner also advances an argument that the coram nobis court applied the wrong standard when analyzing the effect of the invalid aggravating circumstance because it referenced a harmless error standard in its order. However, the coram nobis court correctly cited to the relevant statutory and case law on coram nobis, as summarized above by this court, and consistently applied the correct "may have" standard throughout its order. Therefore, this court disagrees with the Petitioner's argument.

## A. *Death Sentence for the Murder of Mr. Newsom*

Based on the Thomas testimony, the coram nobis court concluded that the body mutilation aggravating circumstance could not support the Petitioner's death sentence for the murder of Mr. Newsom. Observing that "significant evidence" existed to support each of the three remaining aggravating circumstances and that the mitigating evidence "did not carry much weight," the court further concluded, though, that there was no reasonable basis, even in light of Thomas's testimony, that at least one juror may have voted for a sentence less than death.

The Petitioner contests the coram nobis court's ruling, contending that "while impossible to determine what weight the jury gave to" the invalid aggravator, "a reasonable basis exists to conclude that it was more than de minimus." In support of that contention, the Petitioner notes that photographs of Mr. Newsom's body were shown to the jury during the guilt phase of the trial and refers to the prosecution's closing argument during the sentencing phase, which was quoted earlier in this opinion. He also contends that Thomas's testimony may have impacted the jury's consideration of the heinous, atrocious, and cruel aggravating circumstance because it "attributed to Boyd most, if not all, of the

actions the Tennessee Supreme Court used to justify" that factor with respect to Mr. Newsom's murder. While recognizing the vicarious application of the heinous, atrocious, and cruel factor, the Petitioner nonetheless argues that Thomas's testimony may have changed the mind of at least one juror. The Petitioner also argues Thomas's testimony may have affected the jury's consideration of the avoidance of prosecution aggravator because it revealed Boyd, not the Petitioner, burned Mr. Newsom's body. The Petitioner also asserts that the jury may have viewed the fact that the Petitioner did not personally shoot Mr. Newsom or burn his body favorably toward mitigation. *See* Tenn. Code Ann. § 39-13-204(j)(5) ("the defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor").

Again, this court reviews the ruling of the coram nobis court under an abuse of discretion standard, i.e., whether the court reached an illogical or unreasonable conclusion or based its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc.*, 312 S.W.3d at 524. The fact that the Petitioner may not have personally shot Mr. Newsom or burned his body does not discount the other damning evidence encompassing the Petitioner's direct involvement in these crimes. Indeed, Thomas's testimony does not undermine any of that evidence. The evidence supporting the application of the heinous, atrocious, and cruel aggravating circumstance may be applied to the Petitioner vicariously. *Johnson*, 38 S.W.3d at 63. So too may the evidence supporting the avoidance-of-prosecution aggravator. Thus, contrary to the Petitioner's contention, the Thomas testimony does not "exculpate" him of these aggravating circumstances. In addition, evidence supporting the felony murder aggravating circumstance was especially strong. That factor contemplated the Petitioner's multiple convictions for the other crimes committed in relation to the murders of the two victims. *Davidson*, 509 S.W.3d at 221.

The Petitioner actively participated in the entire criminal episode. The evidence clearly refutes the Petitioner's suggestion that he was a minor participant. Again, the Petitioner's house served as the base camp for the criminal operation. As discussed above, Thomas's testimony, considered in light of all of the trial evidence, does not discount the Petitioner's role in initiating the kidnappings; participating in the heinous, atrocious, and cruel killings; and taking or directing the necessary steps to avoid arrest for the crimes. This court agrees with the coram nobis court that there is no reasonable basis to conclude that Thomas's testimony may have led to a different sentence. The coram nobis court applied the correct standard in reviewing the newly discovered evidence, and the court's decision was clearly within the range of acceptable alternative dispositions. The Petitioner merely disagrees with the coram nobis court's assessment of Thomas's testimony. However, the coram nobis court's assessment is not clearly erroneous. Moreover, the sentences that the Petitioner's codefendants received have no bearing on a coram nobis analysis with respect to newly discovered evidence as applied to the Petitioner's case.

Accordingly, the coram nobis court did not abuse its discretion by denying relief on this claim.

## B. *Death Sentence for the Murder of Ms. Christian*

The Petitioner argues that because Thomas testified that Boyd, not the Petitioner, shot Mr. Newsom, the jury may not have found the existence of the felony murder aggravator that Ms. Christian's murder was committed while the Petitioner had a substantial role in Mr. Newsom's death. The coram nobis court disagreed. As discussed above, even if the Petitioner did not personally kill Mr. Newsom, he was still at least criminally responsible for his death. Moreover, as the State asserts, the felony murder aggravator for the murder of Ms. Christian also applies to his substantial role in committing the other applicable offenses. There is simply no reasonable basis to conclude that Thomas's testimony may have resulted in a different sentence for the murder of Ms. Christian. The coram nobis court did abuse its discretion by denying relief on this claim.

## III. *Constitutional Claims*

The Petitioner presented due process and Eighth Amendment claims in his coram nobis petition based on the Thomas testimony, mainly that imposition of the death penalty based on an invalid aggravator represents cruel and unusual punishment. However, the coram nobis court held that constitutional claims may not be raised in a petition seeking relief under the coram nobis statute. *See* Tenn. Code Ann. § 40-26-105(b); *Nunley*, 552 S.W.3d 3d 800. The Petitioner argues that the coram nobis court erred by refusing to address his constitutional claims. This court already has discussed the impact of the *Nunley* ruling in relation to the sentencing hearing claims the Petitioner raised in his coram nobis petition. Contrary to the Petitioner's assertion in his error coram nobis brief, however, our supreme court specifically held in *Nunley*, albeit in a footnote, that "the writ of error *coram nobis* is not a procedure for remedying deprivations of constitutional rights; such claims are cognizable in post-conviction proceedings." 552 S.W.3d at 829 n.22. Thus, the coram nobis court did not err by dismissing the constitutional claim raised in the coram nobis petition. Nonetheless, this court already has fully addressed the Petitioner's due process and Eighth Amendment claims earlier in this opinion in the post-conviction context.

## Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the post-conviction court erred by determining that Thomas's anticipated testimony at Boyd's upcoming trial was not relevant to the Petitioner's claim for post-conviction relief because Thomas's testimony would have invalidated one of the four aggravating circumstances found by the jury to impose the Petitioner's death sentence for Mr. Newsom.

However, we also conclude that the error was harmless beyond a reasonable doubt. Therefore, we affirm the post-conviction and coram nobis courts' denial of the petitions.

_____
NORMA MCGEE OGLE, JUDGE